RECORD NO. 14-2254

## IN THE

# United States Court of Appeals

## FOR THE FOURTH CIRCUIT

## LIBERTY UNIVERSITY, INC.,

*Plaintiff-Appellee,*

v.

## CITIZENS INSURANCE COMPANY OF AMERICA, HANOVER AMERICAN INSURANCE COMPANY and HANOVER INSURANCE COMPANY,

*Defendants-Appellants.*

---

### OPENING BRIEF OF DEFENDANTS-APPELLANTS

---

### ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF VIRGINIA AT LYNCHBURG

Thomas S. Garrett
HARMAN CLAYTOR
 CORRIGAN & WELLMAN
P. O. Box 70280
Richmond, Virginia 23255
(804) 762-8005 (Telephone)
tgarrett@hccw.com

**Counsel for Defendants-Appellants**

John P. Malloy
Wystan M. Ackerman
ROBINSON & COLE LLP
280 Trumbull Street
Hartford, Connecticut 06103
(860) 275-8200 (Telephone)
jmalloy@rc.com
wackerman@rc.com

**Counsel for Defendants-Appellants**

---

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Only one form needs to be completed for a party even if the party is represented by more than one attorney. Disclosures must be filed on behalf of all parties to a civil, agency, bankruptcy or mandamus case. Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements. Counsel has a continuing duty to update this information.

No. 14-2254     Caption: Liberty University, Inc. v. Citizens Insurance Company

Pursuant to FRAP 26.1 and Local Rule 26.1,

Citizen Insurance Company of America, Hanover American Insurance Company and Hanover Insurance Company who are Appellants                , make the following disclosure:
(name of party/amicus)          (appellant/appellee/amicus)

| | | YES | NO |
|---|---|---|---|
| 1. | Is party/amicus a publicly held corporation or other publicly held entity? | ☐ | ☒ |
| 2. | Does party/amicus have any parent corporations? | ☒ | ☐ |
| | If yes, identify all parent corporations, including grandparent and great-grandparent corporations: | | |
| | All appellants are direct or indirect subsidiaries of The Hanover Insurance Group, Inc., which is a publicly-traded corporation. | | |
| 3. | Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity? | ☒ | ☐ |
| | If yes, identify all such owners: | | |
| | All appellants are direct or indirect subsidiaries of The Hanover Insurance Group, Inc., which is a publicly-traded corporation. | | |
| 4. | Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))? | ☐ | ☒ |
| | If yes, identify entity and nature of interest: | | |
| 5. | Is party a trade association? (amici curiae do not complete this question) | ☐ | ☒ |
| | If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member: | | |
| 6. | Does this case arise out of a bankruptcy proceeding? | ☐ | ☒ |
| | If yes, identify any trustee and the members of any creditors' committee: | | |

i

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................iv

JURISDICTIONAL STATEMENT ........................................................1

STATEMENT OF THE ISSUE..............................................................2

STATEMENT OF THE CASE................................................................2

    A.    Allegations in the Vermont Action ......................................2

        1.    The Vermont Family Court Proceedings ...................4

        2.    The Kidnapping.........................................................5

        3.    Claims Alleged Against Liberty ................................8

    B.    The Insurance Policies.........................................................10

        1.    The CGL Policy .......................................................10

        2.    The SELL Coverage Form.......................................13

    C.    This Declaratory Judgment Action .....................................15

    D.    The District Court's Summary Judgment Ruling ................15

    E.    The District Court's Entry of Final Judgment ....................18

SUMMARY OF ARGUMENT ............................................................19

ARGUMENT ....................................................................................23

I.    STANDARD OF REVIEW AND APPLICABLE LEGAL
    STANDARDS ...........................................................................23

II.    THE DISTRICT COURT ERRED IN FINDING A DUTY TO
    DEFEND UNDER COVERAGE A OF THE CGL POLICY ....................24

    A.    The Vermont Action Does Not Allege a Claim for "Bodily
        Injury," as the District Court Correctly Held ....................25

    B.    The Vermont Action Does Not Seek Damages Because of
        "Property Damage ................................................................26

    C.    The Vermont Action Does Not Allege An "Occurrence ...................28

        1.    The Allegations Do Not Plead An "Accident.........................29

        2.    The "Separation of Insureds" Provision Does Not Create
            Coverage .................................................................37

ii

# <u>TABLE OF CONTENTS</u>

**Page**

3.  The District Court Improperly Suggested the Creation of a New Cause of Action in an Effort to Find Coverage............40

D.  The "Expected or Intended Injury" Exclusion Applies ....................42

III.  THE DISTRICT COURT ERRED IN FINDING A DUTY TO DEFEND UNDER COVERAGE B OF THE CGL POLICY....................45

A.  The Knowing Violation Exclusion Applies ......................................45

B.  The Criminal Acts Exclusion Applies...............................................47

IV.  THE DISTRICT COURT ERRED IN FINDING A DUTY TO DEFEND UNDER THE SELL COVERAGE ............................................49

A.  The Claims Alleged in the Vermont Action Do Not Arise Out of a "Wrongful Act...............................................................................50

B.  The Intentional or Criminal Act Exclusion Applies .........................53

CONCLUSION........................................................................................................55

REQUEST FOR ORAL ARGUMENT ..................................................................55

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AES Corp. v. Steadfast Ins. Co.,* 725 S.E.2d 532 (Va. 2012) ............................23, 29

*Aetna Cas. & Sur. Co. v. Dannenfeldt,*
    778 F. Supp. 484 (D. Ariz. 1991) .......................................................................42

*American & Foreign Ins. Co. v. Church Schools in the Diocese,*
    645 F. Supp. 628 (E.D. Va. 1986) ......................................................................25

*American Guar. & Liab. Ins. Co. v. 1906 Co.,*
    129 F.3d 802 (5th Cir. 1997) ..............................................................................39

*Bankers & Shippers Ins. Co. v. Watson,* 224 S.E.2d 312 (Va. 1976).....................37

*Bostic v. Schaefer,*760 F.3d 352 (4th Cir. 2014)....................................................23

*Burton v. State Farm Mut. Auto. Ins. Co.,*
    335 F.2d 317 (5th Cir. 1964) ........................................................33, 35, 36, 39

*CACI Int'l, Inc. v. St. Paul Fire & Marine Ins. Co.,*
    566 F.3d 150 (4th Cir. 2009) ........................................................24, 40, 42, 52

*Cincinnati Ins. Co. v. Milliken & Co.,* 857 F.2d 979 (4th Cir. 1988).....................27

*Collin v. American Empire Ins. Co.,*
    26 Cal. Rptr. 2d 391 (Cal. Ct. App. 1994).........................................................28

*Commercial Bus. Sys., Inc. v. Bellsouth Services, Inc.,*
    453 S.E.2d 261 (Va. 1995) .................................................................................39

*Cowan Sys. v. Harleysville Mut. Ins. Co.,* 457 F.3d 368 (4th Cir. 2006)...............26

*Dairyland Ins. Co. v. Douthat,* 449 S.E.2d 799 (Va. 1994) ...................................24

*Donnelly v. Transportation Ins. Co.,* 589 F.2d 761 (4th Cir. 1978).......................41

*Dooley v. Hartford Accident & Indem. Co.,*
    716 F.3d 131 (4th Cir. 2013) ..............................................................................54

# TABLE OF AUTHORITIES

*Page(s)*

*Fuisz v. Selective Ins. Co.,* 61 F.3d 238 (4th Cir. 1995) ...........................................41

*Jews for Jesus, Inc. v. Jewish Community Relations Council, Inc.,*
968 F.2d 286 (2d Cir. 1992) .......................................................32, 46

*Millennium Inorganic Chems. Ltd. v. Nat'l Union Fire Ins. Co. of*
*Pittsburgh,* 744 F.3d 279 (4th Cir. 2014) ...........................................55

*Minn. Lawyers Mut. Ins. Co. v. Antonelli, Terry, Stout & Kraus, LLP,*
472 Fed. Appx. 219 (4th Cir. 2012)............................... 33, 35, 39, 40, 42, 49, 52

*Nat'l Fruit Prod. Co. v. Fireman's Fund Ins. Co.,*
178 F.3d 1285, 1999 WL 270033 (4th Cir. May 4, 1999) ...........................34, 35

*National Elec. Mfrs. Ass'n v. Gulf Underwriters Ins. Co.,*
162 F.3d 821 (4th Cir. 1998) ..............................................................23

*Nationwide Mut. Ins. Co. v. Overlook, LLC,* 785 F. Supp. 2d 502
(E.D. Va. 2011) ....................................................................................27

*New Hampshire Ins. Co. v. Blue Water Off Shore, LLC,*
2009 WL 1509458 (S.D. Ala.) (S.D. Ala. May 4, 2009) ...................48

*P'ship Umbrella, Inc. v. Fed. Ins. Co.,* 530 S.E.2d 154 (Va. 2000).......................24

*In re Peanut Crop Ins. Litig.,* 524 F.3d 458 (4th Cir. 2008)...................................23

*Pulliam v. Coastal Emergency Servs. of Richmond, Inc.,*
509 S.E.2d 307 (Va. 1999) ................................................................38

*Res. Bankshares Corp. v. St. Paul Mercury Ins. Co.,*
323 F. Supp. 2d 709 (E.D. Va. 2004) ..................................................2

*Resource Bankshares Corp. v. St. Paul Mercury Ins. Co.,*
407 F.3d 631 (4th Cir. 2005) ...................................................2, 23, 35

*Rockingham Mut. Ins. Co. v. Davis,*
2002 WL 737474, *8 (Va. Cir. Ct. Apr. 26, 2002)...........................36

*Sansotta v. Town of Nags Head,* 724 F.3d 533 (4th Cir. 2013)................................2

# <u>TABLE OF AUTHORITIES</u>

*Page(s)*

*Seabulk Offshore, Ltd. v. Am. Home Assur. Co.,*
    377 F.3d 408 (4th Cir. 2004) ................................................................23

*St. Paul Fire & Marine Ins. Co. v. Jacobson,*
    826 F. Supp. 155 (E.D. Va. 1993) ....................................................15, 33

*Town Crier, Inc. v. Hume,* 721 F. Supp. 99 (E.D. Va. 1989) ...............40, 42, 44, 52

*Transit Casualty Co. v. Hartman's, Inc.,* 239 S.E.2d 894 (Va. 1978) ....................37

*TravCo Ins. Co. v. Ward,* 736 S.E.2d 321 (Va. 2012) ...........................................39

*Travelers Indem. Co. of Conn. v. Sterling Wholesale, LLC,*
    2013 WL 3816736 (E.D. Va. July 19, 2013) ........................................41

*Travelers Indem. Co. v. Obenshain,* 245 S.E.2d 247 (Va. 1978) ....................35, 44

*Travelers Prop. Cas. Co. of Am. v. Mericle,*
    486 Fed. App'x 233 (3d Cir. 2012) .....................................................46

*United States v. Applins,* 637 F.3d 59 (2d Cir. 2011) .....................................32, 46

*Va. Farm Bureau Mut. Ins. Co. v. Williams,*
    677 S.E.2d 299 (Va. 2009) ..................................................................54

*Virginia Elec. & Power Co. v. Northbrook Prop. & Cas. Ins. Co.,*
    475 S.E.2d 264 (Va. 1996) ..............................................................33, 36

*West American Ins. Co. v. Bank of Isle of Wight,*
    673 F. Supp. 760 (E.D. Va. 1987) .......................................................25

*West Bend Mut. Ins. Co. v. Crichton,*
    319 F. Supp. 2d 887 (N.D. Ill. 2004) ..................................................46

**Statutes and Court Rules**

18 U.S.C. § 1204 ..................................................................................................48

18 U.S.C. § 1962(c) ................................................................................................9

18 U.S.C. § 1962(d) ............................................................................................9, 48

## <u>TABLE OF AUTHORITIES</u>

*Page(s)*

28 U.S.C. § 1291 ....................................................................................1, 2

28 U.S.C. § 1292(e) ...................................................................................1

28 U.S.C. § 1332(a) ...................................................................................1

42 U.S.C. § 1985(3) ............................................................................32, 46

Va. Code § 18.2-47 .........................................................................32, 46, 48

Fed. R. Civ. P. 12(b)(6)............................................ 19, 21, 22, 33, 36, 39

Fed. R. Civ. P. 54(b) ........................................................................1, 2, 18

## JURISDICTIONAL STATEMENT

The District Court had subject-matter jurisdiction under 28 U.S.C. § 1332(a) because the parties are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs. Plaintiff-Appellee Liberty University, Inc. ("Liberty") is a citizen of Virginia, where it is incorporated and has its principal place of business. (JA11, ¶1.) None of the Defendants-Appellants (collectively referred to as "Hanover") is a citizen of Virginia. Citizens Insurance Company of America is a citizen of Michigan, where it is incorporated and Massachusetts, where it has its principal place of business. (JA11 ¶2; JA18 ¶2.) Hanover American Insurance Company and Hanover Insurance Company are both citizens of New Hampshire, where they are incorporated, and Massachusetts, where they have their principal places of business. (JA11 ¶¶3, 4; JA18 ¶¶3, 4.) The amount in controversy exceeds $75,000, as demonstrated by the District Court's judgment in the amount of $153,372.57, exclusive of interest and costs. (JA344.)

This Court has appellate jurisdiction under 28 U.S.C. § 1291, or 28 U.S.C. § 1292(e) and Fed. R. Civ. P. 54(b). The District Court entered a final judgment in favor of Liberty, fully resolving Liberty's claim that Hanover had a duty to defend it in the underlying lawsuit. Liberty's remaining claim that Hanover has a duty to indemnify was dismissed without prejudice. The District Court recognized that that claim was not ripe because Liberty has been dismissed from the underlying lawsuit

1

and may never be brought back into it. The District Court also found that there was

no just reason for delay in the entry of judgment under Fed. R. Civ. P. 54(b).[1]

(JA344.)

This appeal is timely. The final judgment was entered on November 6, 2014.

(JA344.) Hanover filed its notice of appeal on November 14, 2014. (JA346.)

## STATEMENT OF THE ISSUE

Whether the District Court erred in concluding that Hanover had a duty to

defend Liberty in an underlying lawsuit in the U.S. District Court for the District of

Vermont (the "Vermont Action"), and thus erred in granting summary judgment in

favor of Liberty and denying Hanover's summary judgment motion.

## STATEMENT OF THE CASE

### A.    Allegations in the Vermont Action

The Vermont Action arises out of an alleged international kidnapping of a

child who was born during the course of a same-sex civil union recognized under

Vermont law. After the civil union was dissolved, in the midst of a contentious

custody battle, the child, Isabella Miller-Jenkins ("Isabella") was allegedly

kidnapped by her biological mother, Lisa Miller ("Miller") and brought to

---

[1] *See Sansotta v. Town of Nags Head*, 724 F.3d 533, 539 (4th Cir. 2013) (appellate jurisdiction existed under § 1291 where district court decided one claim on summary judgment and dismissed remaining claim as not ripe); *Res. Bankshares Corp. v. St. Paul Mercury Ins. Co.*, 323 F. Supp. 2d 709, 723 (E.D. Va. 2004), *rev'd*, 407 F.3d 631 (4th Cir. 2005) (reviewing district court's ruling on duty to defend that was certified under Rule 54(b)).

2

Nicaragua. The kidnapping allegedly was assisted by the defendants in the Vermont Action, including Liberty, in direct violation of Vermont and Virginia court orders. All of this was purportedly based on religious beliefs that the child should no longer have contact with Janet Jenkins ("Jenkins"), Isabella's other legally-recognized parent. (JA37.)

As the District Court explained, "the Jenkins Complaint . . . generally alleged that Liberty conspired to kidnap Isabella, racketeered to kidnap Isabella, and conspired to violate Jenkins and Isabella's civil rights . . . ." (JA290.) The preamble to the Amended Complaint in the Vermont Action describes the essence of its allegations: that Jenkins, for herself and as next friend of Isabella, "complain against *Defendants* for *intentionally* kidnapping and conspiring to kidnap Isabella . . . and *intentionally* causing her continued detention outside the State of Vermont to the present day." (JA37. (emphasis added).) The preamble further alleges that "*the parties* conspired to kidnap Isabella Miller-Jenkins and ensure her detention outside of the United States . . . ." (JA37-38.) That is simply not the type of conduct that liability insurance covers.

### 1.    The Vermont Family Court Proceedings

The Amended Complaint in the Vermont Action further alleges as follows[2]:
Isabella was born in 2002, while Miller and Jenkins were united in a Vermont civil
union. (JA40 ¶19.) In 2004, Miller moved with Isabella to Virginia and petitioned
a Vermont Family Court to dissolve the civil union. (*Id.*) At that time, Miller
adopted religious beliefs "that homosexuality was sinful and that Isabella should be
shielded from exposure to the 'lifestyle.'" (JA40 ¶20.) The Vermont court
repeatedly ordered visitation between Isabella and Jenkins. Miller repeatedly
refused to comply with those orders and was found in contempt. (JA40-41 ¶¶20-
21.)

Starting in 2004, Miller was represented in court proceedings by Mathew
Staver, Dean of Liberty's Law School, and Rena Lindevaldsen, a law professor at
the school. (JA41 ¶22.) In 2007, there was a six-month period during which Miller
complied with court orders and allowed visitation between Isabella and Jenkins.
(JA41 ¶24.) Miller then became closely involved with the Thomas Road Baptist
Church ("TRBC"), of which Liberty is alleged to be a "related ministry." The
church provided Miller with housing, a job and a vehicle, and encouraged Miller to

---

[2] Because the duty to defend is based on the allegations in the Vermont Action,
those allegations are summarized here as if they were true. Hanover does not take
any position herein as to the truth or falsity of any particular allegations.

defy the court orders and not allow contact between Isabella and Jenkins. (JA41 ¶25.)

In 2008, Jerry Falwell, Jr., President of Liberty, allegedly donated "substantial sums" to an organization known as the Protect Isabella Coalition, for television and radio commercials condemning the parent-child contact between Isabella and Jenkins. (JA42 ¶27.) Miller continued to refuse to comply with court orders. (JA42 ¶28.)

Jenkins then asked the Vermont Family Court to transfer full custody of Isabella to her. (JA42 ¶29.) On September 4, 2009, the court entered an interim order for contact between Jenkins and Isabella from September 25 to 27, 2009. (JA43 ¶32.)

### 2.    The Kidnapping

The Vermont Action alleges that "[b]y late summer of 2009, Lisa Miller and her co-conspirators [which include Liberty] had devised a plan to kidnap Isabella and avoid detection by infiltrating the Beachy Amish-Mennonite Christian Brotherhood to enable her abduction of Isabella." (JA43 ¶34.)

On September 21, 2009, Miller and Isabella, disguised as Amish-Mennonites, were transported to the Canadian border by Philip Zodhiates. Miller and Isabella crossed the border in a taxi, and subsequently flew to Mexico, then El Salvador and then Nicaragua. (JA43 ¶¶36-37.) Miller and Isabella apparently have

been in hiding in Nicaragua since then. (JA44 ¶39.) The Vermont Family Court ultimately ordered a transfer of Isabella's custody to Jenkins effective January 1, 2010, at which point Miller and Isabella were hiding in Nicaragua. (JA44 ¶43.)

Victoria Hyden ("Hyden"), formerly known as Victoria Zodhiates, is alleged to be "an employee and agent of both Liberty University, Inc. and its related ministry Thomas Road Baptist Church, Inc. . . . . in relation to the claims set forth" in the Jenkins complaint. (JA39 ¶13.) Hyden was a "student worker" at Liberty's law school reporting to the Dean, and she allegedly e-mailed her co-workers to solicit "donations for supplies to send to Lisa Miller to enable her to remain outside the country." (JA44 ¶41.) Hyden allegedly was involved in assisting with arranging for transportation for Miller within Virginia in connection with her flight to Nicaragua. (*Id.*) Rena Lindevaldsen, a law professor at Liberty, was also involved in 2009 (after the kidnapping occurred) with a Facebook website called "Only One Mommy" that solicited donations. (JA44 ¶43.)

The Vermont Action further alleges that Dean Staver and Professor Lindevaldsen "routinely instructed their Law School students that the correct course of action for a person in Lisa Miller's situation would be to engage in 'civil disobedience' and defy court orders." (JA45 ¶47.) In addition,

> Liberty University encouraged its agents to disregard state laws governing parental rights, particularly Vermont's law giving rights to members of same-sex families. The TRBC and Liberty University through its public declaration promoted, condoned and explicitly

6

ratified its agent's tortious, racketeering activity. These agents and
employees have followed this direction, making TRBC and Liberty
University liable in *respondeat superior* for the consequences.
. . .
With the assistance of Thomas Road Baptist Church members, as well
as Kenneth Miller, Timothy Miller, CAM [i.e., Christian Aid
Ministries, Inc.], Philip Zodhiates, Victoria Zodhiates, in their
individual capacities and as agents of Response Unlimited and Liberty
University, Lisa Miller was able to leave the United States in advance
of September 25, 2009 and remain there past January 1, 2010.

(JA45-46 ¶49 (underscore added).)

Kenneth Miller was indicted in federal court for his involvement in the

kidnapping. Evidence of telephone contact from a co-defendant to Liberty on the

day of the kidnapping was revealed by the criminal investigation:

> At the trial, the government introduced phone records that showed
> phone calls made from Philip Zodhiates's cell phone between 1:28pm
> and 1:30pm on September 22, 2009, to a cell phone with an Orlando
> area code that is registered to Liberty Counsel, a landline registered to
> Liberty Counsel, and a landline registered to Liberty University.
> Mathew Staver, Dean of Liberty University, splits his time between
> Lynchburg, Virginia and Orlando, Florida. At the time that the calls
> were made, Philip Zodhiates was still en route back to Virginia after
> depositing Lisa Miller and Isabella near the Canadian border.

(JA47 ¶57.)

Jenkins further alleges that, in 2011, "Victoria [Hyden], an assistant in the

[Liberty] Law School knew of Lisa Miller's whereabouts and solicited donations

from other Law School employees for her aid. Upon information and belief, other

law school employees who spoke to Victoria about Lisa Miller's whereabouts were

too intimidated to come forward to law enforcement for fear of angering Dean

Staver and losing their jobs." (JA47-48 ¶59.) Several law school employees were fired, but "Victoria Hyden is still an employee of the law school, even though her tortious conduct involving Isabella Miller-Jenkins has been in public court records for over a year." (JA47-48 ¶59.) The law professors continued to pursue appeals for Miller after her departure, stating that they had advance instructions from her. (*Id.*)

> The Vermont Action ultimately alleges that:

> Based on the foregoing, *all of the Defendants named herein, in both their individual capacities and as agents of* TRBC, *Liberty University*, Response Unlimited, Inc., and CAM *are liable for conspiring with Lisa Miller and with each other to kidnap Isabella Miller-Jenkins, assure her continued detention outside of the State of Vermont*, and for conspiring with Kenneth Miller to participate in the affairs of the Beachy Amish-Mennonite Brotherhood through a pattern of racketeering activity. *Defendants are also liable for conspiring to violate Janet Jenkins' and Isabella Miller-Jenkins' rights to a parent-child relationship* on account of Isabella having two mothers instead of a mother and a father . . . .

(JA49 ¶62 (emphasis added).)

### 3. Claims Alleged Against Liberty

The claims alleged against Liberty in the Vermont Action are as follows:

- <u>Intentional Tort of Kidnapping (Count One)</u>: The kidnapping claim alleges that "Lisa Miller did conspire with, and was aided and abetted by . . . *Victoria Hyden*, f/k/a Victoria Zodhiates, individually and *as an agent of* . . . *Liberty University* . . . ." (JA49 ¶64 (emphasis added).)

- Violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(d) (Count Three): The RICO claim alleges that Kenneth Miller "has conspired with others, including Lisa Miller . . . *Victoria Hyden*, f/k/a Victoria Zodhiates, individually and *as an agent of . . . Liberty University* and its related ministry TRBC, *Liberty University*, and its related ministry TRBC . . . for the commission of a violation of 18 U.S.C. § 1962(c) through the aforementioned pattern of racketeering." (JA51 ¶72 (emphasis added).)

- Conspiracy to Violate Civil Rights (Count Four): This claim alleges that "Lisa Miller conspired with . . . *Victoria Hyden*, f/k/a Victoria Zodhiates, individually and *as an agent of . . . Liberty University* . . . to violate the civil rights of Janet Jenkins and Isabella Miller-Jenkins, on account of gender, and to prevent the Courts of Vermont from securing Janet Jenkins and Isabella Miller-Jenkins equal protection of their rights to a parent-child relationship under the law." (JA51-52 ¶75 (emphasis added).)

The damages alleged are that Janet Jenkins "has suffered extreme emotional distress and loss of her daughter's companionship," and financial losses in the form of legal fees and lost business due to devoting time to court hearings and meetings with law enforcement. (JA52 ¶78, 79.) Isabella allegedly "has suffered emotional distress" and a reduced standard of living, including the loss of financial support

from Jenkins. (JA52-53 ¶¶80-81.) In addition, "on information and belief, Isabella is currently being deprived of an education, medical and dental care and the support of her extended family . . . ." (JA52-53 ¶81.)

In short, as the District Court recognized, "the Jenkins Complaint made claims for only intentional torts" and violation of RICO, a federal criminal statute. (JA301.)

**B.    The Insurance Policies**

There are four liability insurance policies at issue, but several of them have essentially-identical relevant provisions. Only two coverage forms were analyzed by the parties and the District Court, as discussed below.[3]

**1.    The CGL Policy**

Hanover American Insurance Company issued a policy to Liberty effective from February 1, 2009 to February 1, 2010 (the "CGL Policy"), which includes commercial general liability ("CGL") coverage. (JA54.) Coverages A and B of this policy are potentially implicated here.

---

[3] There is a 2009-2010 umbrella policy that contains grants of coverage, exclusions and definitions applicable to Coverages A and B that, to the extent pertinent to this case, are essentially identical to the CGL Policy discussed below (except that the umbrella policy would apply only if the limits of the CGL Policy were exhausted). (JA84.) Similarly, there is a 2012-2013 umbrella policy that contains grants of coverage, exclusions and definitions that, to the extent pertinent to this case, are essentially identical to the SELL Coverage discussed below (except that the umbrella coverage would apply only if the limits of the SELL Coverage were exhausted). (JA134.)

**Coverage A**:  Coverage A provides the following grant of coverage:

We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply.. . .

This insurance applies to "bodily injury" and "property damage" only if:

**(1)** The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory"; (JA68.)

The term "bodily injury" is defined as "bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time. 'Bodily injury' includes mental anguish or other mental injury resulting from 'bodily injury.'" (JA63.) The term "property damage" is defined, in pertinent part, as "a. Physical injury to tangible property, including all resulting loss of use of that property.  . . . or b. Loss of use of tangible property that is not injured." (JA81-82.) The term "occurrence" is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (JA81.) The term "suit" is defined, in pertinent part, as "a civil proceeding in which damages because of 'bodily injury,' 'property damage' or 'personal and advertising injury' to which this insurance applies are alleged." (JA82.)

11

Coverage A contains the following relevant exclusion, in pertinent part:

This insurance does not apply to:

**a. Expected or Intended Injury**

"Bodily injury" or "property damage" expected or intended from the standpoint of the insured.

<u>**Coverage B:**</u> Coverage B has the following grant of coverage for "personal and advertising injury," in pertinent part:

a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "personal and advertising injury" to which this insurance does not apply.

b. This insurance applies to "personal and advertising injury" caused by an offense arising out of your business but only if the offense was committed in the "coverage territory" during the policy period.

(JA73.)

The term "personal and advertising injury" is defined, in pertinent part, as "injury, including consequential 'bodily injury', arising out of one or more of the following offenses: a. False arrest, detention or imprisonment . . . ." (JA81.)

Coverage B has the following relevant exclusions:

This insurance does not apply to:

**a. Knowing Violation of Rights of Another**
"Personal and advertising injury" caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal and advertising injury".
. . .
**d. Criminal Acts**
"Personal and advertising injury" arising out of a criminal act committed by or at the direction of the insured. (JA73.)

### 2.     The SELL Coverage Form

A policy issued by Citizens Insurance Company of America to Liberty for the policy period of February 1, 2012 to February 1, 2013 contains a School and Educators Legal Liability Coverage Form (the "SELL Coverage"), which provides the following duty to defend:

We will have the right and duty to defend the insured against any "claim"[4]:

**1)** Alleging injury arising out of a "wrongful act" to which this insurance applies and seeking "loss" because of such injury.
. . .
We will have no duty to defend any insured against any "claim" to which this Coverage Part does not apply.
(JA116.)

The term "wrongful act" is defined as follows:

"Wrongful act" means any breach of duty, neglect, error, omission, misstatement, or misleading statement committed by an insured:

---

[4] The term "claim" is defined to include "a 'suit' against an insured for a 'wrongful act' to which this insurance applies." (JA128.) The term "suit" is defined to include "a civil proceeding in which damages because of a 'wrongful act' to which this insurance applies are alleged." (JA129.)

13

**a.** In the lawful discharge of the duties that are characteristic of, distinctive or inherent to the operation and functioning of an educational institution; and

**b.** While acting within the course and scope of their duties for the named insured.

(JA130.)

The SELL Coverage contains the following relevant exclusions, in pertinent

part:

This insurance does not apply to:

a. Intentional or Criminal Act

Any "claim" arising out of any intentional, dishonest, fraudulent, criminal, or malicious act or omission or any willful violation of law by the insured.

. . .

This exclusion applies regardless of whether the insured is actually charged with or convicted of a crime and regardless whether any insured subjectively intended the injury or damage for which a claim is made.

. . .

c. Bodily Injury, Personal and Advertising Injury, or Property Damage

"Bodily Injury", "property damage" or "personal and advertising injury"

(JA114, JA116.)

The terms "bodily injury," "property damage" or "personal and advertising

injury" used in this exclusion are defined, in pertinent part, in the same manner as

in the CGL Policy. (JA128-129.)

### C.     This Declaratory Judgment Action

In June of 2013, Liberty filed a complaint against Hanover seeking a declaratory judgment that Hanover owed a duty to defend and indemnify it in the Vermont Action. (JA3.) After Liberty's Complaint was amended and answered (JA3-4), the parties filed cross-motions for summary judgment in January and February of 2014 (JA 6).

### D.     The District Court's Summary Judgment Ruling

In April of 2014, the District Court issued a memorandum opinion holding that Hanover owed a duty to defend. The District Court granted Liberty's motion for summary judgment in full, and denied Hanover's motion for summary judgment in full.[5] (JA335.)

**Coverage A:** The District Court concluded that, under Coverage A of the CGL Policy (covering claims for "bodily injury" or "property damage"), the Vermont Action did not allege a claim for "bodily injury." This was because emotional distress does not constitute "bodily injury" under the terms of the policy and Virginia law, and the alleged deprivations of medical and dental care, without actual physical harm, do not constitute "bodily injury."  (JA297-298.) However, a

---

[5] The District Court also correctly struck an affidavit of Dean Staver, attempting to dispute certain allegations of the Jenkins complaint. (JA334.) It is well-settled that, under Virginia law, matters outside the underlying complaint cannot properly be considered in determining the duty to defend. *St. Paul Fire & Marine Ins. Co. v. Jacobson*, 826 F. Supp. 155, 160 (E.D. Va. 1993).

claim for "property damage" was alleged, according to the District Court, because the Vermont Action could be construed as alleging that Isabella lost the use of "books, toys, clothing, and other material goods" that she used in the United States and were not brought to Nicaragua. (JA298-300.)

The District Court further concluded that the alleged "property damage" was caused by an "occurrence." While recognizing that an intentional act is not an "occurrence" under Virginia law and that "the Jenkins Complaint made claims for only intentional torts" (JA301), the District Court reasoned that "the Jenkins Complaint *alleged insufficient facts to hold Liberty vicariously liable* for Hyden, Staver or Lindevaldsen's actions," and that "[t]he Jenkins Complaint also *did not sufficiently allege* that Liberty was directly liable for the intentional torts . . . ." (JA303 (emphasis added).) The District Court also focused on a "Separation of Insureds" provision in the CGL Policy, finding it ambiguous regarding "whether the expectations of Liberty's agents and employees would be imputed to Liberty under the contract." (JA309.) The District Court further concluded that, although not alleged in the Vermont Action, there might be a potentially-viable claim against Liberty for "negligent training, supervision or retention of Hyden, Staver, or Lindevaldsen," although the District Court acknowledged that no such cause of action has even been recognized by the Virginia Supreme Court. (JA315-316.)

16

These rulings regarding the insufficiency of allegations of vicarious liability and the possibility of a negligent supervision claim were the lynchpin of the District Court's entire decision. For these same reasons, the District Court also concluded that the "Expected or Intended Injury" exclusion did not preclude coverage. (JA321-322.)

**Coverage B:** The District Court found that coverage existed under Coverage B of the CGL Policy because the Vermont Action alleged injuries arising out of "false arrest, detention or imprisonment" of Isabella. The "Knowing Violation" exclusion was found inapplicable for the same reasons that the court found that there was an "occurrence." (JA324.) In addressing the criminal acts exclusion, the District Court recognized that "[k]idnapping and RICO violations can certainly constitute criminal acts," but concluded that "the *allegations insufficiently tie Liberty to any criminal acts* either directly or vicariously . . . ." (JA326 (emphasis added).)

**SELL Coverage:** The District Court also found a duty to defend under the SELL Coverage. It acknowledged that "Hanover would have no duty to defend Liberty under the SELL Endorsement if the intentional torts were the only allegations against Liberty," because they would not qualify as "wrongful acts." (JA329.) The District Court held, however, that the unpled negligent supervision claim would be potentially covered under the SELL Coverage because classroom

17

discussions about civil disobedience and hiring and firing decisions by Dean Staver would fall within the scope of the SELL Coverage. (JA329-330.) The intentional or criminal acts exclusion was found inapplicable because the Vermont Action "*insufficiently alleged* direct or vicarious liability and facts to support those links," and the exclusion was found to be in conflict with the "separation of insureds" clause. (JA332 (emphasis added).)

### E.    The District Court's Entry of Final Judgment

After the summary judgment ruling, on November 4, 2014, the parties entered into a stipulation regarding the defense costs through Liberty's dismissal from the Vermont Action (for lack of personal jurisdiction), so that a final judgment could be entered while preserving Hanover's appellate rights. (JA338.) On November 6, 2014, the District Court entered a final judgment, awarding damages in favor of Liberty (defense costs in the Vermont Action), dismissing Liberty's claims relating to the duty to indemnify without prejudice (recognizing that claim was not ripe), and finding that there was no just reason for delay under Fed. R. Civ. P. 54(b). (JA344.) On November 14, 2014, Hanover timely noticed this appeal. (JA346.)

## SUMMARY OF ARGUMENT

The District Court's summary judgment ruling on the duty to defend is reviewed *de novo*. Under Virginia's "eight corners rule," this Court must determine whether the allegations in the Vermont Action fall within the scope of the policies' coverage. The District Court's principal errors were: (1) evaluating the "sufficiency" of the allegations in the Jenkins complaint as if the court were deciding a Rule 12(b)(6) motion in the Vermont Action, rather than deciding whether, if Jenkins prevailed on her allegations, there would be coverage; and (2) finding coverage based on facts purportedly alleging negligent supervision or retention of employees, which were not pleaded.

**Coverage A of the CGL Policy:** Hanover has no duty to defend under Coverage A because the Vermont Action does not allege a claim for damages because of "bodily injury" or "property damage." The term "bodily injury" is defined as "bodily injury, sickness, or disease" and "includes mental anguish or other mental injury resulting" therefrom. (JA63, 68.) Here, the Vermont Action alleges only emotional distress and Isabella's alleged deprivation of medical and dental care. As the District Court correctly recognized, under the terms of the policy and Virginia law, emotional distress does not constitute "bodily injury," and a deprivation of medical and dental care, without actual physical harm, is not "bodily injury."

The Vermont Action also does not seek damages because of "property damage," which is defined to include "[l]oss of use of tangible property that is not physically injured." (JA81-82.) The District Court surmised that Isabella likely had books, toys and clothing that were not taken to Nicaragua, and therefore she lost the use of that property. This was error because: (1) suppositions about additional allegations that were not made is not appropriate in deciding the duty to defend; (2) the damages sought in the Vermont Action do not include damages because of the loss of use of books, toys or clothing; and (3) taking a child away from her books and toys is not "property damage." If this Court concludes that the Vermont Action does not allege damages because of "bodily injury" or "property damage," that ends the analysis under Coverage A.

Coverage A also does not apply because the Vermont Action does not allege that any "personal injury" or "property damage" was caused by an "occurrence," i.e., an "accident." (JA81.) Under Virginia Supreme Court authority, an "occurrence" is an unexpected, fortuitous, chance event. Intentional acts and the natural or probable consequences of intentional acts do not constitute an "occurrence." Here, the Vermont Action focuses entirely on deliberate conduct, pleading intentional torts. A kidnapping and assistance provided before and after a kidnapping is intentional, criminal conduct. Jenkins' complaint does not allege accidental or negligent conduct, or unanticipated results. The District Court erred

20

in finding an "occurrence" on the grounds that: (1) the allegations of vicarious liability were too "conclusory" and not pleaded well enough for Liberty to be held liable; (2) a "separation of insureds" provision prevented the intentional conduct of Liberty's alleged agents from being imputed to Liberty; and (3) Jenkins might have a potential, but not pleaded, cause of action against Liberty for negligent training, supervision or retention of its employees. These rulings go far beyond the District Court's proper role in deciding the duty to defend. The District Court should have decided whether, *assuming* Jenkins' allegations were sufficient to state a claim and she prevailed, the claims were covered. It was incorrect to decide, in effect, whether a Rule 12(b)(6) motion in the Vermont Action would be successful. The District Court also incorrectly construed the "separation of insureds" clause, which is not relevant here because there is only one insured making a claim for coverage, and a vicarious liability claim by definition requires that the agent's acts be imputed to the principal. Moreover, the "Expected or Intended Injury" exclusion also bars coverage under Coverage A, because, based on the allegations, any "bodily injury" or "property damage" was expected or intended by Liberty.

**Coverage B of the CGL Policy:** Coverage B of the CGL Policy does not apply because, to the extent the Vermont Action seeks damages against Liberty arising out of the "[f]alse arrest, detention or imprisonment" of Isabella, the "Knowing Violation of Rights of Another" and "Criminal Acts" exclusions apply.

The Vermont Action alleges that all of the defendants, including Liberty, were involved in conspiring to kidnap Isabella, commit violations of RICO and violate Jenkins' and Isabella's civil rights. Jenkins' complaint repeatedly alleges knowing violations of the law by Liberty, and that Liberty encouraged and promoted those violations. The Vermont Action also clearly pleads injuries arising out of criminal acts, including kidnapping and violation of RICO, and therefore the "Criminal Acts" exclusion applies. In finding these exclusions inapplicable, the District Court erroneously focused on the sufficiency of the allegations, as if it were deciding a Rule 12(b)(6) motion in the Vermont Action.

**SELL Coverage:** The SELL Coverage does not apply because: (1) there was no allegation of a "wrongful act" because none of the misconduct alleged was part of the "lawful discharge of the duties . . . of an educational institution" (JA130.). Rather, allegations of participating in a conspiracy to kidnap a child, raising money to aid in the defiance of court orders, urging the defiance of court orders, etc., is antithetical to the "lawful" duties of a law school. Moreover, Liberty's conduct was alleged to be intentional and criminal conduct that falls within the "Intentional or Criminal Act" exclusion to the SELL Coverage.

For all of these reasons, the District Court's judgment should be reversed.

# ARGUMENT

## I.    STANDARD OF REVIEW AND APPLICABLE LEGAL STANDARDS

A district court's decision on cross-motions for summary judgment is reviewed *de novo*.  *Bostic v. Schaefer*, 760 F.3d 352, 370 (4th Cir. 2014). This Court also reviews *de novo* a district court's ruling on a question of insurance policy interpretation, including whether a duty to defend exists. *In re Peanut Crop Ins. Litig.*, 524 F.3d 458, 470 (4th Cir. 2008); *National Elec. Mfrs. Ass'n v. Gulf Underwriters Ins. Co.*, 162 F.3d 821, 824 (4th Cir. 1998).

The parties agree that Virginia law applies.[6] Virginia follows the "eight corners rule," under which the court determines whether a duty to defend exists by comparing the allegations in the underlying complaint with the terms of the insurance policy. *AES Corp. v. Steadfast Ins. Co.*, 725 S.E.2d 532, 535 (Va. 2012). A duty to defend "arises whenever the complaint alleges facts and circumstances, some of which would, if proved, fall within the risk covered by the policy. On the other hand, if it appears clearly that the insurer would not be liable under its contract for any judgment *based upon the allegations*, it has no duty even to

---

[6] The District Court hearing a diversity case in Virginia was required to apply Virginia's choice-of-law rules.  Under those rules, Virginia law applies to an insurance policy issued to a Virginia corporation located in Virginia.  *Resource Bankshares Corp. v. St. Paul Mercury Ins. Co.*, 407 F.3d 631, 635-36 (4th Cir. 2005); *Seabulk Offshore, Ltd. v. Am. Home Assur. Co.*, 377 F.3d 408, 419 (4th Cir. 2004). Here, the policies were issued to Liberty at its Lynchburg, Virginia location. (JA55, JA85, JA111, JA134.)

defend." *Id.* (emphasis added; citations omitted); *see also CACI Int'l, Inc. v. St. Paul Fire & Marine Ins. Co.*, 566 F.3d 150, 155 (4th Cir. 2009) (explaining Virginia law on duty to defend).

Under Virginia law, insurance policies are "contracts whose terms are construed in accordance with the general principles applicable to all contracts." *Dairyland Ins. Co. v. Douthat*, 449 S.E.2d 799, 801 (Va. 1994). "[W]hen the language in an insurance policy is clear and unambiguous, courts do not employ rules of construction; rather, they give the language its plain and ordinary meaning and enforce the policy as written." *P'ship Umbrella, Inc. v. Fed. Ins. Co.*, 530 S.E.2d 154, 160 (Va. 2000).

## II.     THE DISTRICT COURT ERRED IN FINDING A DUTY TO DEFEND UNDER COVERAGE A OF THE CGL POLICY

Under Coverage A of the CGL Policy, Hanover has a duty to defend only where a suit against Liberty seeks damages because of "bodily injury" or "property damage" caused by an "occurrence," and where no exclusion applies. (JA68-69.) Here, the District Court correctly held that the Vermont Action does not seek damages for "bodily injury," but erred in finding that a claim for "property damage" is alleged. The District Court also erred in finding that there was an "occurrence" and that the "Expected or Intended Injury" exclusion did not bar coverage.

## A.    The Vermont Action Does Not Allege a Claim for "Bodily Injury," as the District Court Correctly Held

Coverage A provides a duty to defend a suit against Liberty seeking damages for "bodily injury," which is defined as "bodily injury, sickness, or disease sustained by a person, including death resulting from any of these at any time. Bodily injury' includes mental anguish or other mental injury resulting from 'bodily injury.'" (JA63, JA68.) Here, the Vermont Action alleges only emotional distress, and that "on information and belief, Isabella is currently being deprived of . . . medical and dental care . . . ." (JA52-53.) The District Court correctly held that these allegations do not seek damages for "bodily injury, sickness or disease" because emotional distress does not constitute "bodily injury, sickness or disease" under the terms of the policy and applicable Virginia law. The policy explains that "mental anguish or other mental injury" damages are covered only if "resulting from" "bodily injury, sickness, or disease . . . ." (JA63.) A deprivation of medical and dental care also does not, without alleging actual physical harm, plead a "bodily injury" claim. (JA297-298.)  *See West American Ins. Co. v. Bank of Isle of Wight*, 673 F. Supp. 760, 765 (E.D. Va. 1987) (holding that "'bodily injury' encompasses actual physical harm caused by negligence, but not emotional distress"); *American & Foreign Ins. Co. v. Church Schools in the Diocese*, 645 F. Supp. 628, 632 (E.D. Va. 1986) (same result).

**B.    The Vermont Action Does Not Seek Damages Because of "Property Damage"**

The CGL Policy also provides a duty to defend a suit seeking damages because of "property damage," defined as "[p]hysical injury to tangible property, including all resulting loss of use of that property," or "[l]oss of use of tangible property that is not physically injured." (JA81-82.) The District Court held that the Vermont Action alleged "loss of use of tangible property that is not physically injured" because "[f]rom the facts alleged in the Jenkins Complaint, it is clear Isabella used to possess certain items in the United States, like books, toys, clothing, and other material goods, that she can no longer use in Nicaragua." (JA299.) As support for this conclusion, the District Court cited an allegation in the Vermont Action that "elders of the Thomas Road Baptist Church packed up the personal belongings of Lisa Miller in two bags" that were transported to Nicaragua. (JA299, JA44 ¶42.) The District Court apparently made a supposition that some or all of Isabella's books, toys and clothing were not included in these two bags, although that is not alleged. Perhaps the items Isabella wanted were brought to Nicaragua to make her comfortable. The District Court might also have been speculating about books, toys, etc. that may have been kept for Isabella's use when she visited Jenkins in Vermont. But that also is not alleged.

Such speculation about possible additional allegations that might be made is not appropriate in determining the duty to defend. *Cowan Sys. v. Harleysville Mut.*

26

*Ins. Co.*, 457 F.3d 368, 375 (4th Cir. 2006) (facts "not alleged in the underlying complaint" cannot be considered in determining whether a duty to defend exists) (applying Maryland law); *Nationwide Mut. Ins. Co. v. Overlook, LLC*, 785 F. Supp. 2d 502, 534 (E.D. Va. 2011) (where it was conceivable that the plaintiff in the underlying case might pursue claims "in a way that was not pled in the state court complaint," that was insufficient to trigger the duty to defend).

Even if the District Court's speculation about what items were not taken to Nicaragua were appropriate, the CGL Policy provides a duty to defend only "against any 'suit' seeking *those damages*," i.e., "damages because of . . . 'property damage' to which this insurance applies." (JA68 (emphasis added).) The Vermont Action contains six paragraphs detailing at length specifically what damages are sought. These paragraphs list legal fees, loss of business incurred by Jenkins, unpaid court fines, emotional distress damages, loss of child support, and, on information and belief, Isabella's deprivation of an education and medical and dental care and support of her extended family. (JA52-53 ¶¶78-83.) These damages do not, however, include any damages for Isabella's loss of use of books, toys or clothing. Thus, even if the Vermont Action alleges "property damage," it does not seek *damages because of* "property damage," and accordingly Hanover has no duty to defend. *See Cincinnati Ins. Co. v. Milliken & Co.*, 857 F.2d 979, 981 (4th Cir. 1988) (no duty to defend because complaint against insured did not seek

27

damages because of "property damage," but only equitable relief).

The District Court's ruling also stretches the policy language well beyond its plain meaning by concluding that taking a child away from her books and toys, etc. is "[l]oss of use of tangible property that is not physically injured." As a California appellate court has explained, "'Loss of use' of property is different from 'loss' of property. To take a simple example, assume that an automobile is stolen from its owner. The value of the 'loss of use' of the car is the rental value of a substitute vehicle; the value of the 'loss' of the car is its replacement cost." *Collin v. American Empire Ins. Co.*, 26 Cal. Rptr. 2d 391, 408-409 (Cal. Ct. App. 1994). There is no claim in the Vermont Action for the value of substitute books or toys, and accordingly no coverage exists.

### C.     The Vermont Action Does Not Allege An "Occurrence"

If this Court concludes that the Vermont Action does not allege "bodily injury" or "property damage," there is no duty to defend under Coverage A of the CGL Policy, and the Court can proceed to the other coverages. But even if "bodily injury" or "property damage" is alleged, Coverage A does not apply because the Vermont Action does not allege that any injury or damage was caused by an "occurrence," defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (JA81.)

### 1. The Allegations Do Not Plead An "Accident"

In construing the same policy language at issue here, the Virginia Supreme Court has explained that an "accident" is "an event which creates an effect which is not the natural or probable consequence of the means employed and is not intended, designed, or reasonably anticipated. An accidental injury is one that 'happen[s] by chance, or unexpectedly; taking place not according to the usual course of things; casual; fortuitous." *AES*, 725 S.E.2d at 536 (citation omitted). "[A]n intentional act is neither an 'occurrence' nor an 'accident' and therefore is not covered . . . .  If a result is the natural or probable consequence of an insured's intentional act, it is not an accident." *Id.* (citations omitted). Moreover, "[w]here the harmful consequences of an act are alleged to have been not just possible, but the natural or probable consequences of an intentional act, choosing to perform the act deliberately, even if in ignorance of that fact, does not make the resulting injury an 'accident' even when the complaint alleges that such action was negligent." *Id.* at 538.

Here, the Vermont Action does not allege an "accident" within any reasonable interpretation of that word. Rather, it focuses entirely on *deliberate* conduct by the defendants in connection with encouraging and promoting the defiance of court orders, and the kidnapping of Isabella and keeping her and Miller in hiding in Nicaragua. There is no allegation of conduct by Liberty that could be

reasonably characterized as an "accident" or mistake. Nor does Jenkins' complaint allege that Liberty's conduct led to unintended results.

The preamble to the amended complaint in the Vermont Action describes the gravamen of all the allegations—that the plaintiffs "complain against Defendants [including Liberty] for intentionally kidnapping and conspiring to kidnap Isabella . . . and intentionally causing her continued detention outside the State of Vermont . . . ." (JA37.) Central allegations of Liberty's conduct, all of which plead intentional actions, include allegations that:

1) Liberty's president, Jerry Falwell, Jr., donated "substantial sums" to an organization formed for the express purpose of promoting the defiance of court orders—preventing court-ordered contact between Jenkins and Isabella. Dean Staver and Prof. Lindevaldsen also solicited donations for this organization. (JA42 ¶27.)

2) Hyden, an employee and alleged agent of Liberty (JA39 ¶13) assisted in arranging for transportation in connection with Miller's flight to Nicaragua, and solicited donations from her co-workers to help Miller in Nicaragua. (JA44 ¶41.)

3) Prof. Lindevaldsen solicited donations through a "Only One Mommy" website, including after Miller had kidnapped Isabella and taken her to Nicaragua. (JA44-45 ¶43.)

4) Dean Staver and Prof. Lindevaldsen instructed their students that it was appropriate "civil disobedience" for Miller to defy court orders. (JA45 ¶47.)

5) Liberty continued to employ Hyden after her misconduct became public, and Dean Staver intimidated other Liberty employees to discourage them from talking with law enforcement. (JA47-48 ¶59.)

6) Telephone records obtained in a federal criminal investigation revealed that, shortly after Philip Zodhiates dropped Miller and Isabella near the Canadian border, he made several phone calls to cell phone numbers and a landline registered to Liberty and/or Dean Staver. (JA47 ¶57.)

7) "Liberty University encouraged its agents to disregard state laws governing parental rights, particularly Vermont's law giving rights to members of same-sex families," and "through its public declaration promoted, condoned and explicitly ratified its agent's tortious, racketeering activity," thereby making it "liable in *respondeat superior* for the consequences." (JA 45-46 ¶49.)

Ultimately, the three causes of action alleged against Liberty are all based on and require proof of intentional conduct, as the District Court recognized (*see* JA301 ("the Jenkins Complaint made claims for only intentional torts")):

- Count One alleges the intentional tort of kidnapping. It alleges that "Lisa Miller did conspire with, and was aided and abetted by . . . Victoria Hyden,

31

f/k/a Victoria Zodhiates, individually and as agent of . . . Liberty University
. . . ." (JA49 ¶64.) Kidnapping is, of course, a crime requiring a showing of
intentional conduct. Va. Code § 18.2-47.

- Count Three pleads a RICO conspiracy claim, alleging that Kenneth Miller
  "has conspired with others, including . . . Victoria Hyden, f/k/a Victoria
  Zodhiates, individually and as agent of . . . Liberty University, and its related
  ministry TRBC, [and] Liberty University . . . ." (JA51 ¶72.) A RICO
  conspiracy claim requires a showing of intentional conduct. *United States v.
  Applins*, 637 F.3d 59, 81 (2d Cir. 2011) (elements of RICO conspiracy claim
  are "that the defendant knowingly joined in a conspiracy the objective of
  which was to operate that enterprise through an identified pattern of
  racketeering activity").

- Count Four pleads a conspiracy to violate civil rights, alleging that "Lisa
  Miller conspired with . . . Victoria Hyden, f/k/a Victoria Zodhiates,
  individually and as agent of . . . Liberty University . . . TRBC and its related
  ministry Liberty University to violate the civil rights of Janet Jenkins and
  Isabella Miller-Jenkins . . . ." (JA51-52 ¶75.) This claim also requires a
  showing of intentional conduct. 42 U.S.C. § 1985(3); *Jews for Jesus, Inc. v.
  Jewish Community Relations Council, Inc.*, 968 F.2d 286, 290 (2d Cir.
  1992).

32

The District Court held that, notwithstanding that the Vermont Action alleged "only intentional torts" (JA301), "the Jenkins Complaint alleged *insufficient facts to hold Liberty vicariously liable* for Hyden, Staver, or Lindevaldsen's actions under agency or respondeat superior theories," and "did not *sufficiently allege* that Liberty was directly liable for the intentional torts, as is required to avoid the duty to defend." (JA303 (emphasis added).)

In effect, the District Court viewed its role as analogous to deciding a Rule 12(b)(6) motion to dismiss in the Vermont Action challenging the sufficiency of the allegations against Liberty. This was error as a matter of law because determining whether an insurer owes a duty to defend does not depend on the sufficiency of the allegations to state a claim. The question is whether, *assuming* the plaintiff prevails on the allegations, they would fall within the scope of coverage provided by the policy, not whether the allegations would survive a Rule 12 motion in the underlying action. As this Court has explained, under Virginia law the court must "evaluate the [underlying] complaint *presuming that plaintiffs will prevail.*" *Minn. Lawyers Mut. Ins. Co. v. Antonelli, Terry, Stout & Kraus, LLP*, 472 Fed. Appx. 219, 224-25 (4th Cir. 2012) (per curiam; unpublished) (emphasis added); *see also Virginia Elec. & Power Co. v. Northbrook Prop. & Cas. Ins. Co.*, 475 S.E.2d 264, 266 (Va. 1996) (merits of underlying case are irrelevant to determining the duty to defend); *Burton v. State Farm Mut. Auto. Ins. Co.*, 335

F.2d 317, 323 (5th Cir. 1964) ("the duty of defense has nothing at all to do with whether the suits are intrinsically meritorious or not," or whether the underlying suit is "subject to a motion to dismiss for failure to state a claim"); *St. Paul Fire & Marine Ins. Co. v. Jacobson*, 826 F. Supp. 155, 160 (E.D. Va. 1993) (the "duty to defend is determined solely by examining whether the complaint's allegations fall within the scope of the policy's coverage").

In determining the duty to defend, a court must also presume that Jenkins will prevail on her allegations of vicarious liability of Liberty based on the intentionally injurious conduct of Hyden, regardless of whether those allegations are sufficient to state a claim. In *Nat'l Fruit Prod. Co. v. Fireman's Fund Ins. Co.*, 178 F.3d 1285 (table), 1999 WL 270033 (4th Cir. May 4, 1999) (per curiam; unpublished), this Court addressed coverage under a CGL policy where a corporation was alleged to be liable for the intentional conduct of its employee, who allegedly sexually harassed and raped another employee. *Id.* at *2. Without assessing the sufficiency of the allegations to state a claim, this Court concluded that a count alleging that the corporation "engaged in intentional sexual discrimination and wrongful conduct . . . clearly is not covered," and, similarly, that "[a]llegations of agency liability for an employee's intentional conduct do not invoke the defendants' duty to defend . . . ." *Id.* at *4 n.4. That is precisely what is alleged here—exclusively intentional conduct by Liberty (through its dean,

34

professor, and employee), and agency liability for its employees' intentional conduct. Whether in fact those employees had the proper authority to do on behalf of Liberty what they allegedly did—or whether Liberty could actually be held liable *at trial* for their conduct, is irrelevant. What matters in determining the duty to defend is only what is alleged. *Minn. Lawyers*, 472 Fed. Appx. at 224-25; *Burton*, 335 F.2d at 323. What is alleged here was exclusively intentional conduct, regardless of whether Liberty would be ultimately held liable for it.

In *National Fruit*, the only claim that this Court found worthy of any extended discussion was a count that alleged that the employer "created a cultural climate which facilitated and fostered a hostile work environment . . . ." *Id.* at *4. The claimant seeking coverage attempted to characterize this allegation as negligence. But this Court disagreed because "[t]he complaint does not allege that [the employer] acted negligently in breach of a duty owed to [the claimant], nor does it allege negligence by [the supervisor]." Id. at *5. Rather, the allegations were "based solely upon . . . intentional acts," and therefore there was no duty to defend. *Id.* The same is true here—there are no allegations in the Vermont Action of negligent conduct by Liberty or its alleged agents. All of the causes of action plead and require proof of intentional conduct, as discussed above. *See also Resource Bankshares Corp. v. St. Paul Mercury Ins. Co.*, 407 F.3d 631, 639 (4th Cir. 2005) (no duty to defend complaint alleging intentional conduct); *Travelers*

35

*Indem. Co. v. Obenshain*, 245 S.E.2d 247, 249 (Va. 1978) (same); *Rockingham Mut. Ins. Co. v. Davis*, 2002 WL 737474, *8 (Va. Cir. Ct. Apr. 26, 2002) ("when an employer is alleged to be liable for his employer's intentional torts under the doctrine of respondeat superior, these torts cannot be considered accidental 'occurrences,' even when there has been no allegation that the employer intended, expected, or ratified the torts").

The District Court erred in determining the duty to defend based on its conclusion that Jenkins' allegations were "conclusory" and insufficient to state a *respondeat superior* claim under Virginia law. (JA310-314.) If the District Court were sitting in Vermont and deciding whether to dismiss Liberty from the Vermont Action under Rule 12(b)(6), that analysis might have been correct. But it has nothing to do with whether or not the claims allege an "occurrence" requiring a duty to defend. *See Burton*, 335 F.2d at 323; *Virginia Electric*, 475 S.E.2d at 266.

## 2.    The "Separation of Insureds" Provision Does Not Create Coverage

The District Court also concluded that the "Separation of Insureds"

provision in the CGL Policy "prevents this Court from imputing the intentions of

Liberty's alleged agents and employees Hyden, Staver or Lindevaldsen to

Liberty." (JA303.) This clause provides that:

> Except with respect to the Limits of Insurance, and any rights or
> duties specifically assigned in this Coverage Part to the first Named
> Insured, this insurance applies:
> a.  As if each Named Insured were the only Named Insured; and
> b.  Separately to each insured against whom claim is made or "suit" is
>     brought. (JA79.)

This clause is irrelevant here because it applies where there is more than one

insured making a claim for coverage. If, for example, Staver or Lindevaldsen had

been sued individually and were seeking a defense by Hanover, a court would

analyze separately each individual claim for coverage. This is explained in the

cases cited by the District Court. *See, e.g., Bankers & Shippers Ins. Co. v. Watson*,

224 S.E.2d 312, 317 (Va. 1976) (explaining that similar clause "restrict[s] 'the

insured' to the person claiming coverage," and thus an exclusion must be analyzed

separately for each insured claiming coverage). Courts, however, have declined to

interpret this clause to create coverage for the named insured where the policy

excludes such coverage. *Transit Casualty Co. v. Hartman's, Inc.*, 239 S.E.2d 894,

896 (Va. 1978) (severability of interests clause could not be interpreted to create collision coverage for named insured where such coverage was not purchased).

Here, there is no need for a separate insured-by-insured analysis of coverage because there is only one insured—Liberty—that brought this declaratory judgment action and is making a claim for coverage. The only question is whether, reading the CGL Policy with Liberty as the insured in question, there is a duty to defend. The "separation of insureds" clause does not alter Virginia law and thereby eliminate the doctrine of vicarious liability. It cannot be reasonably read to have that result. It is the allegations in the underlying complaint that impute the agent's intentionally injurious acts to Liberty. Those allegations form the basis of Liberty's alleged vicarious liability, and cannot be ignored. Indeed, there is nothing about the "separation of insureds" provision that permits a court to ignore expressly pleaded allegations when evaluating the insurer's duty to defend under the four corners of the underlying complaint.

The District Court incorrectly concluded that "the 'separation of insureds' provision of the CGL Policy prevents this Court from imputing the intentions of Liberty's alleged agents and employees Hyden, Staver, or Lindevaldsen to Liberty." (JA303.) A corporation, such as Liberty, can act only through its officers, agents and employees. *Pulliam v. Coastal Emergency Servs. of Richmond, Inc.*, 509 S.E.2d 307, 320 (Va. 1999). To interpret the policy as essentially eliminating

the possibility of vicarious liability would render many provisions meaningless where the insured is a corporation. *TravCo Ins. Co. v. Ward*, 736 S.E.2d 321, 325 (Va. 2012) ("No word or clause in the [insurance] contract will be treated as meaningless if a reasonable meaning can be given to it, and there is a presumption that the parties have not used words needlessly."). And to make coverage applicable only where the plaintiff's claim of vicarious liability rises to the level of surviving a Rule 12(b)(6) motion is contrary to the manner in which the duty to defend is to be determined. *Minn. Lawyers*, 472 Fed. Appx. at 224-25; *Burton*, 335 F.2d at 323.  By definition, the doctrine of vicarious liability or respondeat superior imputes the liability of the agent (Hyden) to the principal (Liberty). *See*, *e.g.*, *Commercial Bus. Sys., Inc. v. Bellsouth Services, Inc.*, 453 S.E.2d 261, 265 (Va. 1995). Whether the allegations are sufficiently detailed simply does not matter for purposes of determining the duty to defend.

The Fifth Circuit has squarely rejected the position taken by the District Court, holding that, notwithstanding a "separation of insureds" provision, "no coverage is provided the employer or supervisory personnel for claims of negligent hiring or supervision when the underlying tortious conduct is intentional and when those claims against the employer or supervisor are related to and are interdependent on the employee's intentional misconduct." *American Guar. &*

*Liab. Ins. Co. v. 1906 Co.*, 129 F.3d 802, 809 (5th Cir. 1997). This Court should reach the same result here.

### 3.     The District Court Improperly Suggested the Creation of a New Cause of Action in an Effort to Find Coverage

The District Court also went beyond its proper role in deciding the duty to defend when it suggested the possibility of a new cause of action against Liberty for "negligent training, supervision or retention," which was never pled in the Vermont Action. The District Court hypothesized that, although the Virginia Supreme Court has not yet even recognized this cause of action, it might be created under Virginia law, and the complaint in the Vermont Action might be amended to assert such a claim. (JA314-318.) This analysis turns Virginia insurance law on its head.

This Court has squarely rejected such an approach to determining the duty to defend, explaining that, where the complaint against the insured does not allege a particular claim, this Court will not create it. *Minn. Lawyers*, 472 Fed. Appx. at 225 ("Given that the [underlying] complaint does not assert legal malpractice as an alternative theory, we will not infer such potential liability."); *see also CACI Int'l*, 566 F.3d at 159 (a "theoretical possibility" is insufficient to create a duty to defend); *Town Crier, Inc. v. Hume*, 721 F. Supp. 99, 105 (E.D. Va. 1989) ("The fact that some of the allegations in the case at bar could establish a case for negligent misrepresentation is immaterial because that claim is not made. All the

40

claims in the complaint in issue seek recovery for either intentional harms or for violations of state law and are therefore excluded from coverage.").

The cases relied upon by the District Court do not support its conclusion on this point. In *Travelers Indem. Co. of Conn. v. Sterling Wholesale, LLC*, 2013 WL 3816736 (E.D. Va. July 19, 2013), the court simply held that where the insured allegedly created counterfeit packaging that included other companies' trademarks, that conduct "falls within the ambit of 'infringement of copyright, title or slogan'" within the meaning of a CGL policy. *Id.* at *6-7. In *Donnelly v. Transportation Ins. Co.*, 589 F.2d 761 (4th Cir. 1978) (applying District of Columbia law), the complaint expressly alleged breaches of fiduciary duty, as well as fraudulent or criminal conduct, and this Court found a duty to defend because a breach of fiduciary duty claim would be covered. *Id.* at 767. And in *Fuisz v. Selective Ins. Co.*, 61 F.3d 238 (4th Cir. 1995), this Court simply applied the well-established principle that if claims are pled in the alternative, and at least one of them is covered, there is a duty to defend. There, the defamation allegations included both malicious conduct and a "reckless disregard" claim that the insurer conceded was covered. *Id.* at 244-45. Here, the District Court went far beyond what these other courts have done. It essentially created a brand new potential cause of action that is not alleged.

41

*Aetna Cas. & Sur. Co. v. Dannenfeldt*, 778 F. Supp. 484 (D. Ariz. 1991), also cited by the District Court, actually supports Hanover's position. In *Dannenfeldt*, the court held that, in order for a duty to defend to exist, there must be "some factual showing that the lawsuits actually seek damages resulting from . . . negligence," and there was no such showing in that case. *Id.* at 500-01. Similarly here, there are no allegations of negligence, as the District Court acknowledged when it explained that the Vermont Action "made claims for only intentional torts . . . ." (JA301.)

The fact that the District Court had to suggest a potential cause of action that is not alleged, and not yet even recognized under Virginia law, and then look to an Arizona district court decision that does not support the result reached, demonstrates how the court below erred. The court was stretching to find coverage where it does not exist. *See Minn. Lawyers*, 472 Fed. Appx. at 225; *CACI Int'l*, 566 F.3d at 159; *Town Crier*, 721 F. Supp. at 105.

### D.    The "Expected or Intended Injury" Exclusion Applies

Even if this Court concludes that the Vermont Action pleads a claim for damages because of "bodily injury" or "property damage" caused by an "occurrence," the "Expected or Intended Injury" exclusion in Coverage A of the CGL Policy precludes coverage. It provides that "This insurance does not apply to:

. . . 'Bodily injury' or 'property damage' expected or intended from the standpoint of the insured." (JA69.)

The District Court's finding of "property damage" was based on speculation about Isabella losing the use of books, toys and clothing (JA299.) Even if that were sufficient to trigger coverage, the Vermont Action plainly alleges that Liberty's agents expected or intended to cause that type of harm, by engaging in conduct intended to prevent contact between Jenkins and Isabella, and to encourage violation of court orders. This includes allegations that: Liberty's president donated substantial sums to an organization intended to prevent court-ordered contact between Jenkins and Isabella (JA42 ¶27); Dean Staver and/or Prof. Lindevaldsen raised money for that organization, including after the kidnapping (JA42 ¶27, JA44-45 ¶43); Hyden solicited donations to aid Miller in Nicaragua (JA44 ¶41); Staver and Lindevaldsen instructed their students that defiance of the Vermont court's orders was appropriate (JA45 ¶47); and "Liberty University encouraged its agents to disregard state laws governing parental rights, particularly Vermont's law giving rights to members of same-sex families" and "promoted, condoned and explicitly ratified its agent's tortious, racketeering activity." (JA45-46 ¶49.) Thus, to the extent the District Court found that there was "property damage" based on Isabella's loss of use of books and toys, etc., the allegations demonstrate that that

type of injury was intended or expected by Liberty.[7] *See Obenshain*, 245 S.E.2d at 249 (where complaint against insured alleged only intentional torts, "expected or intended" exclusion applied); *Town Crier*, 721 F. Supp. at 104 ("all claims in the state complaint seek relief only for injuries caused either knowingly or intentionally by the Insureds, or for injuries caused by a violation of a statute. As such these claims are excluded from policy coverage."). Whether this would constitute a basis on which Liberty would be ultimately found liable is irrelevant, as explained above.

The District Court found that this exclusion was not applicable based on the "separation of insureds" provision, and because the Vermont Action did not "sufficiently allege" a basis for holding Liberty responsible for its alleged agents' conduct, and did not "sufficiently allege Liberty's direct liability for intentional torts." (JA322.) For the reasons explained above, the "separation of insureds" provision is not relevant, and the sufficiency of allegations is not a proper basis to determine whether a duty to defend exists. *See* Section II.C., *supra*.

---

[7] Similarly, although there is no proper basis for concluding that the Vermont Action alleges "bodily injury," if the alleged emotional distress and deprivation of medical and dental care were to constitute "bodily injury," the allegations demonstrate that this was intended by Liberty. Liberty's agents unquestionably intended to separate Jenkins from Isabella, and, at a minimum, they would have expected this separation to cause emotional distress. Hyden's participation in the flight to Nicaragua and the various efforts to raise money to aid Miller in Nicaragua obviously would result in Isabella being away from her U.S. doctor and dentist.

## III.    THE DISTRICT COURT ERRED IN FINDING A DUTY TO DEFEND UNDER COVERAGE B OF THE CGL POLICY

Coverage B of the CGL Policy provides a duty to defend a lawsuit seeking damages "because of 'personal and advertising injury' to which this insurance applies." (JA72.) The term "personal and advertising injury" is defined, in pertinent part, as "injury, including consequential 'bodily injury', arising out of one or more of the following offenses: a. False arrest, detention or imprisonment . . . ." (JA81.) Here, although the Vermont Action does seek damages against Liberty "arising out of . . . . [f]alse arrest, detention or imprisonment" of Isabella, there is no coverage under the "Knowing Violation of Rights of Another" and "Criminal Acts" exclusions, addressed below.

### A.    The Knowing Violation Exclusion Applies

The knowing violation exclusion provides that:

This insurance does not apply to:

**a.  Knowing Violation of Rights of Another**
"Personal and advertising injury" caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal and advertising injury".
(JA73.)

This exclusion applies because the Vermont Action alleges not only knowing but intentional conduct by Liberty. As the District Court acknowledged, "the Jenkins Complaint . . . generally alleged that Liberty conspired to kidnap Isabella, racketeered to kidnap Isabella, and conspired to violate Jenkins and

45

Isabella's civil rights . . . ." (JA290.) The Vermont Action expressly pleads that all of the defendants were involved in conspiring to kidnap Isabella. (JA37, JA49 ¶62.) A kidnapping cannot be unintentional. Va. Code § 18.2-47. Where the Vermont Action pleads Liberty's involvement in the intentional tort of kidnapping as part of a conspiracy and through Hyden as its agent (JA49 ¶64), "[t]here is no such thing as accidental participation in a conspiracy." *West Bend Mut. Ins. Co. v. Crichton*, 319 F. Supp. 2d 887, 889 (N.D. Ill. 2004). Similarly, where the Vermont Action pleads a RICO conspiracy claim against Liberty, that is a crime requiring intent. *Applins*, 637 F.3d at 81. The claim for conspiracy to violate civil rights likewise requires a showing of intentional conduct. 42 U.S.C. § 1985(3); *Jews for Jesus*, 968 F.2d at 290.

There can be no question that if Liberty were held responsible, as a co-conspirator, for the "false arrest, detention or imprisonment" of Isabella based on the claims as pled, that would have to be based on a finding that Liberty (or agents for whom it is responsible) acted with knowledge and intent to inflict injury. Where similar facts were alleged, the Third Circuit found the knowing violation exclusion applicable. *Travelers Prop. Cas. Co. of Am. v. Mericle*, 486 Fed. App'x 233, 239 (3d Cir. 2012) (unpublished) (knowing violation exclusion applied where insured allegedly participated in conspiracy in which juvenile court judges were

bribed to sentence juveniles to detention facilities in order to increase construction of those facilities). This Court should reach the same result here.

Nor can it reasonably be suggested, based on the allegations, that Liberty, which operates a law school, and whose primary actors in the relevant events include a law school dean and professor, did not act "with the knowledge that the act would violate the rights of another," inflicting injuries. (JA73.) The Vermont Action alleges that Liberty instructed its students that someone in Miller's situation should "defy court orders" and that "Liberty University encouraged its agents to disregard state laws    . . . ." (JA45-46 ¶¶47, 49.) The violation of court orders would obviously cause injury to the relationship between Jenkins and Isabella, as is alleged. The District Court concluded that "[i]t does not appear from these allegations that Liberty *caused or directed* the knowing violation of Jenkins and Isabella's rights, knowing that personal injury would result." (JA325.) But that is precisely what is alleged—that Liberty "encouraged its agents to disregard state laws" and "promoted, condoned, and explicitly ratified its agent's tortious, racketeering activity." (JA45-46 ¶49.) The exclusion therefore applies.

## B.    The Criminal Acts Exclusion Applies

The criminal acts exclusion also bars coverage under Coverage B of the CGL Policy. It provides that:

This insurance does not apply to:
. . .

47

### d. Criminal Acts

"Personal and advertising injury" arising out of a criminal act committed by or at the direction of the insured. (JA73.)

The international kidnapping of a child for purposes of obstructing parental rights is a federal crime, 18 U.S.C. § 1204, and kidnapping generally is, of course, a crime. Va. Code § 18.2-47. The violation of RICO that Jenkins alleges was committed by Liberty is also a crime. 18 U.S.C. § 1962(d). The Vermont Action repeatedly alleges that all of the defendants, including Liberty, conspired to participate in the kidnapping of Isabella. (JA37, JA46-47 ¶54, JA49 ¶62.) The complaint further alleges that Hyden, alleged to be Liberty's agent, assisted with arranging transportation in connection with the kidnapping. (JA44 ¶41.) It also alleges that, based on information uncovered in a federal criminal investigation, on the very day that the kidnapping occurred, several calls were made by Philip Zodhiates, who brought Miller and Isabella to the Canadian border ,to phone numbers used by Liberty and/or Dean Staver. (JA47 ¶57.)

The complaint in the Vermont Action plainly pleads injuries "arising out of" alleged criminal acts by Liberty and its co-defendants. It makes no difference whether Liberty has been convicted of a crime. *New Hampshire Ins. Co. v. Blue Water Off Shore, LLC*, 2009 WL 1509458, *3 (S.D. Ala.) (S.D. Ala. May 4, 2009) (criminal act exclusion does not require a conviction).

The District Court found this exclusion inapplicable because it concluded that "the allegations insufficiently tie Liberty to any criminal acts either directly or vicariously," and "conclusory allegations of Hyden's agency do not suffice." (JA325-326) As discussed above, it was incorrect for the District Court to focus on the sufficiency of allegations in deciding whether a duty to defend exists. Even if an indictment against Liberty for kidnapping and violation of RICO based on what is alleged, without more, would be dismissed before it ever reached a criminal trial, that is irrelevant here. A court analyzing the duty to defend must presume the plaintiffs will prevail on the claims alleged. *Minn. Lawyers*, 472 Fed. Appx. at 224-25. If this Court presumes that Jenkins will prevail on her claims against Liberty, the criminal act exclusion bars coverage.

## IV.    THE DISTRICT COURT ERRED IN FINDING A DUTY TO DEFEND UNDER THE SELL COVERAGE

The final piece of the coverage analysis is the applicability of the SELL Coverage, which provides a duty to defend a suit against the insured "[a]lleging injury arising out of a 'wrongful act' to which this insurance applies and seeking 'loss' because of such injury." (JA115-116.) This coverage does not apply because: (a) the Vermont Action does not allege a "wrongful act"; and (b) the "Intentional or Criminal Act" exclusion applies.

A. **The Claims Alleged in the Vermont Action Do Not Arise Out of a "Wrongful Act"**

The term "wrongful act" is defined in the SELL Coverage as follows:

"Wrongful act" means any breach of duty, neglect, error, omission, misstatement, or misleading statement committed by an insured:

a. In the ***lawful discharge of the duties*** that are characteristic of, distinctive or inherent to the operation and functioning ***of an educational institution***; and

b. While acting within the course and scope of their duties for the named insured.

(JA130 (emphasis added).)

This coverage does not apply here because the Vermont Action does not allege that Liberty's actions were part of "the lawful discharge of the duties" of an educational institution. Allegations of participating in a conspiracy to kidnap a child, violating RICO, providing aid to a person who has committed an international kidnapping of a child, raising money to aid the defiance of court orders, and encouraging people to defy court orders and disregard state laws is simply not part of the "duties" of an educational institution, let alone its "lawful" duties. To the contrary, Liberty (which, after all, was operating a law school) had a legal duty *not* to engage in such conduct.

Moreover, Liberty's alleged conduct was not "characteristic of, distinctive or inherent to the operation and functioning of an educational institution." The conduct alleged was not part of the operation or functioning of the university, but

50

rather unlawful conduct, or, at a minimum, extraneous conduct not part of operating the university.

The District Court recognized that "Hanover would have no duty to defend Liberty under the SELL Endorsement if the intentional torts were the only allegations against Liberty." (JA329.) The District Court erred, however, in concluding that the allegations did not consist of only intentional torts. In fact, in another portion of the District Court's opinion, it concluded, to the contrary, that "the Jenkins Complaint made claims for only intentional torts . . . ." (JA301.) An intentional tort is unlawful conduct that is plainly not a "wrongful act" that is covered under the SELL Coverage. For that reason alone, this portion of the District Court's ruling should be reversed.

The District Court further concluded that "[o]nly acts committed essentially within the course and scope of an employee's duties for an educational institution are covered by the SELL Endorsement," and that the Vermont Action "never specifically alleged" that Hyden, Staver and Lindevaldsen "acted within the course and scope of their duties for Liberty . . . ." (JA328.) This, however, was a reason *not* to find coverage under the SELL Coverage.

The basis on which the District Court ultimately found coverage was that there was an "implied" claim for negligence by Liberty in urging civil disobedience, and in the training and supervision of Staver, Hyden and

Lindevaldsen. The District Court concluded that these classroom discussions and hiring and firing decisions are part of the "lawful" duties of an educational institution. (JA329-330.) This was error for three reasons. First, the Vermont Action did not plead such a negligence claim, and it was improper for the District Court to hypothesize one. *Minn. Lawyers*, 472 Fed. Appx. at 225; *CACI Int'l*, 566 F.3d at 159; *Town Crier*, 721 F. Supp. at 105. Second, the allegation regarding classroom discussions about civil disobedience and a failure to fire Hyden after her misconduct became public simply provide background and color—it is not the basis on which Jenkins claims "injury" that would trigger coverage under the SELL Coverage. (JA115-116.) Third, these allegations fall outside of the "lawful" duties of an educational institution. The Vermont Action alleges not that Dean Staver and Prof. Lindevaldsen merely participated in academic discussions about civil disobedience, but that they instructed their students that it was *proper* for Miller to "defy court orders"—which cannot be part of the lawful duties of a law school. (JA45 ¶47.) To the extent that hiring and firing of employees may be part of the lawful duties of a law school dean, what is alleged here is that Hyden was retained as an employee of the law school *after* it became well-known that she had participated in an international kidnapping (a federal crime, regardless of whether she was indicted) and providing support for Miller in Nicaragua. (JA47-48 ¶59.) Retaining such an employee also cannot be part of the lawful duties of a law school

dean. The District Court erred in stretching the complaint in the Vermont Action to create coverage where there is none.

### B.     The Intentional or Criminal Act Exclusion Applies

Coverage under the SELL Coverage is also barred by the "Intentional or Criminal Act" exclusion, which provides:

> This insurance does not apply to:
>
> a.  Intentional or Criminal Act
>
>> Any "claim" arising out of any intentional, dishonest, fraudulent, criminal, or malicious act or omission or any willful violation of law by the insured.
>> . . .
>> This exclusion applies regardless of whether the insured is actually charged with or convicted of a crime and regardless whether any insured subjectively intended the injury or damage for which a claim is made.
>> This exclusion precludes coverage for all insured persons under the policy regardless whether the person seeking coverage participated in any way in the intentional or criminal acts or omissions.
>
> (JA114.)

For the same reasons set forth in Sections II.C., II.D. and III.B., *supra*, the conduct alleged in the Vermont Action against Liberty consists of intentional and criminal conduct, to which this exclusion applies.[8] Notably, this exclusion expressly applies even if the insured did not intend to cause injury or damage.

---

[8] The SELL Coverage also excludes coverage for "bodily injury," "property damage" and "personal and advertising injury." (JA116.) Thus, if the Court were to conclude that the Vermont Action alleges a claim for "bodily injury," "property

The District Court concluded that this exclusion did not bar coverage because Jenkins' complaint "insufficiently implicated Liberty in this type of excluded conduct because it insufficiently alleged direct or vicarious liability and facts to support those links," and because the exclusion purportedly conflicted with the "separation of insureds" provision, thereby creating an ambiguity. (JA332.) The District Court erred because the sufficiency of allegations is not an appropriate consideration in determining the duty to defend, as discussed at length above. Moreover, the "separation of insureds" provision is not relevant, as discussed in Section II.C. above. There is also no conflict between the "separation of insureds" clause and the exclusion. The two provisions can easily be read harmoniously, simply by applying the exclusion as written, such that it bars coverage "for all insured persons" regardless of whether they participated in the intentional or criminal conduct. The "separation of insureds" provision does not become meaningless; rather, it applies in various other contexts not involving this particular exclusion. *Dooley v. Hartford Accident & Indem. Co.*, 716 F.3d 131, 135 (4th Cir. 2013) ("We construe the various provisions of an insurance policy together and, if possible, harmonize any internal conflicts to effectuate the parties' intent."); *Va. Farm Bureau Mut. Ins. Co. v. Williams*, 677 S.E.2d 299, 302 (Va. 2009) (stating same rule).

---

damage" or "personal and advertising injury" (which it should not for the reasons discussed above), the SELL Coverage would not apply.

## CONCLUSION

For all of the foregoing reasons, the District Court's judgment should be reversed, and the case should be remanded to the District Court for entry of summary judgment in favor of Hanover. *See*, *e.g.*, *Millennium Inorganic Chems. Ltd. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 744 F.3d 279, 286 (4th Cir. 2014) (reversing district court's ruling on cross-motions for summary judgment on insurance coverage issues, and remanding for entry of summary judgment in favor of insurers).

## REQUEST FOR ORAL ARGUMENT

Hanover respectfully requests oral argument.  This case involves application of several liability insurance coverages to the allegations asserted in a lengthy, 83-paragraph complaint, which resulted in a 55-page decision by the District Court. In light of this complexity, and the potential applicability of the Court's decision to other insurance coverage cases, Hanover respectfully submits that oral argument may aid the Court in rendering its decision.

Respectfully submitted,

/s/ Wystan M. Ackerman
John P. Malloy
Wystan M. Ackerman
Robinson & Cole LLP
280 Trumbull Street
Hartford, CT 06103-3597
jmalloy@rc.com
wackerman@rc.com
Phone: (860) 275-8200
Fax: (860) 275-8299

Thomas S. Garrett
Harman Claytor Corrigan & Wellman
P.O. Box 70280
Richmond, Virginia 23255
(804) 762-8005

*Counsel for Defendants-Appellants*
*Citizens Insurance Company of America,*
*Hanover American Insurance Company and*
*Hanover Insurance Company*

## **CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 12,755 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14 point Times New Roman font.

Dated: Jan. 12, 2015                    /s/ Wystan M. Ackerman
                                        Wystan M. Ackerman

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 12th day of January, 2015, the foregoing Brief

of Defendants-Appellants was filed electronically on the Court's ECF filing system

and was served by Notice of Docket Activity upon each of the following, each of

whom is a "Filing User" with an email address of record with the Court:

    Calvin Wooding Fowler, Jr., Esq. (wfowler@williamsmullen.com)
    Harold Edward Johnson, Esq. (hjohnson@williamsmullen.com)


Dated: Jan. 12, 2015                    /s/ Wystan M. Ackerman
                                        Wystan M. Ackerman



Page 1

178 F.3d 1285, 1999 WL 270033 (C.A.4 (Va.))
**(Table, Text in WESTLAW), Unpublished Disposition**
**(Cite as: 178 F.3d 1285, 1999 WL 270033 (C.A.4 (Va.)))**

▷

NOTICE: THIS IS AN UNPUBLISHED OPINION.

(The Court's decision is referenced in a "Table of Decisions Without Reported Opinions" appearing in the Federal Reporter. See CTA4 Rule 32.1.

United States Court of Appeals, Fourth Circuit.
NATIONAL FRUIT PRODUCT COMPANY, IN-
CORPORATED, Plaintiff-Appellant,
v.
FIREMAN'S FUND INSURANCE COMPANY;
Lumbermens Mutual Casualty Company; Liberty
Mutual Fire Insurance Company, Defendants-
Appellees.

No. 98-1471.
Argued Jan. 28, 1999.
Decided May 4, 1999.

Appeal from the United States District Court for the Western District of Virginia, at Harrisonburg, No. CA-96-122-H; B. Waugh Crigler, Magistrate Judge.
Stephan G. Weil, Dickstein, Shapiro, Morin & Oshinsky, L.L.P., Washington, D.C., for Appellant.

Daniel Leroy Fitch, Wharton, Aldhizer & Weaver, P.L.C., Harrisonburg, Virginia; Thomas Grasty Bell, Jr., Timberlake, Smith, Thomas & Moses, P.C., Staunton, Virginia, for Appellees.

ON BRIEF: Mark H. Kolman, Laura A. Vikander, Dickstein, Shapiro, Morin & Oshinsky, L.L.P., Washington, D.C.; Thomas Moore Lawson, Thomas Moore Lawson, P.C., Winchester, Virginia, for Appellant. Ralph N. Boccarosse, Jr., Siciliano, Ellis, Dyer & Boccarosse, Fairfax, Virginia, for Appellee

Liberty Mutual.

Before WILKINSON, Chief Judge, TRAXLER, Circuit Judge, and GOODWIN, United States District Judge for the Southern District of West Virginia, sitting by designation.

OPINION
PER CURIAM.
**\*1** The plaintiff, National Fruit Product Company, Inc. (NFP), filed the present action against the defendants Fireman's Fund Insurance Company (Fireman's Fund), Lumbermens Mutual Casualty Company (Lumbermens), and Liberty Mutual Fire Insurance Company (Liberty Mutual) (collectively defendants), alleging breach of contract. The district court granted summary judgment in favor of the defendants and denied NFP's motion for partial summary judgment. Because Count IV of Nelson's complaint is clearly a cause of action alleging NFP's vicarious liability for its employee's intentional conduct and not a separate assertion of negligence against NFP, we find that the defendants had no duty to defend the underlying action and therefore did not breach the contract. Therefore, we affirm, although for reasons somewhat different from those stated by the district court.

I.
A.
During 1993 and 1994, NFP was insured by the defendants. Fireman's Fund provided NFP with commercial general liability coverage from January 1, 1993 to December 31, 1993. The policy limit was $1.5 million per occurrence. For the period from January 1, 1994 to January 1, 1995, Lumbermens issued a virtually identical general liability policy to NFP except that the policy limit was $1 million per occurrence. Liberty Mutual provided workers compensa-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

178 F.3d 1285, 1999 WL 270033 (C.A.4 (Va.))
**(Table, Text in WESTLAW), Unpublished Disposition**
**(Cite as: 178 F.3d 1285, 1999 WL 270033 (C.A.4 (Va.)))**
tion coverage to NFP for the period between January 1, 1993 and January 1, 1994, with a policy limit of $500,000 and a defense cost deductible of $200,000.

Both the Fireman's Fund and Lumbermens policies required that the insurer (1) pay "those sums that the insured becomes legally obligated to pay as damages because of bodily injury or property damage to which this insurance applies," and (2) "defend any suit seeking those damages." (J.A. at 126, 149.) Both policies define "bodily injury" as "bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time." (J.A. at 135, 157.) The insurance policies covered only bodily injury which was "caused by an occurrence" and which "occurs during the policy period." (J.A. at 126, 149.) Both policies define "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (J.A. at 136, 159.) Both policies contain language that excludes coverage for bodily injury that is "expected or intended from the standpoint of the insured," (J.A. at 126, 149), or that "aris[es] out of and in the course of employment by the insured." (J.A. at 127, 150.) Finally, both policies establish that for corporations like NFP, "executive officers and directors are insureds, but only with respect to their duties as officers and directors" while employees are insureds "only for acts within the scope of their employment...." (J.A. at 131, 154.)

The Liberty Mutual policy obligated the insurer to pay all amounts that NFP became legally obligated to pay as damages for bodily injury suffered by an NFP employee in the course of the employee's employment. (J.A. at 564.) Liberty Mutual's coverage was limited to "bodily injury by accident" that occurs "during the policy period." (*Id.*) There is essentially no difference between the "bodily injury by accident" language in the Liberty Mutual policy and the "bodily injury" arising from an "occurrence" provision in the Fireman's Fund and Lumbermens's policies. The

Liberty Mutual policy specifically excludes coverage for "bodily injury intentionally caused or aggravated by [NFP]" (J.A. at 565), but it does not contain an exclusion for bodily injury arising out of and in the course of employment.

B.

**\*2** The issues in this case revolve around the defendants' denial of coverage for NFP's defense of claims brought against it by Stacey Nelson (Nelson), a former NFP employee. In June 1995, Nelson filed suit in the Circuit Court for Kent County, Michigan, against NFP and James Mortensen (Mortensen), her immediate supervisor at the NFP facility in Kent City, Michigan. Nelson alleged that she worked for NFP from November 15, 1993, until June 27, 1994, when NFP terminated her employment. In her complaint, Nelson asserted that during the time in which she was employed by NFP, Mortensen assaulted, raped, and sexually harassed her.[FN1] In addition, Nelson's complaint contained three allegations against NFP: (1) that NFP, as an employer, was strictly liable for Mortensen's *quid pro quo* sexual harassment of Nelson (Count II), (J.A. at 169), (2) that NFP, as an employer, was liable to Nelson because it "created a cultural climate which facilitated and fostered a hostile work environment and which emboldened persons such as defendant Mortensen to make unwelcome sexual advances, engage in acts of sexual harassment, and commit acts of sexual assault" (Count IV), (J.A. at 171-72), and (3) that NFP was liable for intentionally discriminating against Nelson by wrongly terminating her in June 1994 (Count V). (J.A. at 172-73.)

> FN1. Specifically, Nelson claimed that beginning in December 1993 and continuing through the duration of her employment, Mortensen engaged in unwanted sexual contact toward her-*i.e.* grabbing her breasts, touching her buttocks and touching her pubic area. Moreover, she asserted that in Feb-

178 F.3d 1285, 1999 WL 270033 (C.A.4 (Va.))
**(Table, Text in WESTLAW), Unpublished Disposition**
**(Cite as: 178 F.3d 1285, 1999 WL 270033 (C.A.4 (Va.)))**

ruary 1994, Mortensen followed her to her apartment after work, made a sexual advance toward her, demanded that she undress, and requested sexual favors from her. Nelson also claimed that on a Saturday in late May 1994, she encountered Mortensen at the office and that he directed her to an unused storeroom where he forcibly assaulted and raped her. Further, Nelson alleged that a week later, she again encountered Mortensen at the office on a Saturday and he again ordered her to the storeroom where he once again raped her. In June 1994, Nelson was terminated from her employment with NFP.

In April 1995, prior to Nelson's filing of her complaint, NFP received a demand package outlining her allegations. NFP was served with Nelson's complaint on June 22, 1995. On December 1, 1995, NFP notified its insurance broker, Johnson & Higgins, in writing of the pending action and requested that NFP's insurers provide a defense to Nelson's claim and indemnify NFP for any amount for which it might be found liable. Thereafter, Johnson & Higgins forwarded copies of Nelson's complaint and NFP's requests to Lumbermens' and Fireman's Fund. NFP notified Liberty Mutual directly and made the same requests for a defense to the suit and indemnification. Upon receiving the notice of the complaint and NFP's request, each of the defendants disclaimed coverage and refused to pay NFP's defense or indemnify costs.

After receiving the denials from the defendants, NFP engaged in settlement negotiations with Nelson's counsel. In June 1996, NFP reached a settlement agreement with Nelson whereby NFP paid $350,000 in return for a total release of Nelson's claims against it. NFP's other defense costs totaled $210,767.91. In this action, NFP claims that the defendants breached the insurance contracts by wrongfully disclaiming NFP's claim for defense and indem-

nity costs. NFP seeks compensatory damages.

### C.

On February 24, 1998, the district court held a hearing at which it considered NFP's partial motion for summary judgment and the defendants' motion for summary judgment. At that hearing, the district court granted summary judgment in favor of the defendants, finding that the creation of a hostile work environment, as alleged in Count IV of Nelson's complaint, could not be an "accident" that caused bodily injury. Specifically, the district court stated as follows:

**\*3** Now, that's what's going to go up on appeal. I hold that the allegations of creating a hostile work environment is not, as a matter of law, and has never been, as a matter of law, potentially an accident, to trigger either the duty to defend or eventually the responsibility to indemnify.

(J.A. at 799-800.) The district court concluded that "Fireman's Fund and Lumbermens had no duty to defend, because they had absolutely clearly unambiguously no liability under the policy; and Liberty ... likewise has no duty to defend, because it had no liability." (J.A. at 802.) NFP appeals from that ruling.

### II.
### A.

In reviewing a district court's grant of summary judgment, the Court views the evidence in a light most favorable to the non-moving party. *Westfarm Assoc., L.P. v. Washington Suburban Sanitary Comm'n, 66 F.3d 669, 678 (4th Cir.1995).* If there are no genuine issues of material fact, then the court may enter judgment on the pleadings. *Id.* The review is *de novo. Id.*

### B.

To determine whether coverage exists under an insurance policy such that a duty to defend a lawsuit

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

178 F.3d 1285, 1999 WL 270033 (C.A.4 (Va.))

**(Table, Text in WESTLAW), Unpublished Disposition**
**(Cite as: 178 F.3d 1285, 1999 WL 270033 (C.A.4 (Va.)))**

is invoked, a court must compare the allegations in the underlying complaint with the terms of the policy. *Town Crier, Inc. v. Hume,* 721 F.Supp. 99, 103 (E.D.Va.1989); *American and Foreign Ins. Co. v. Church Schools,* 645 F.Supp. 628, 631 (E.D.Va.1986); *Travelers Indem. Co. v. Obenshain,* 219 Va. 44, 245 S.E.2d 247, 249 (Va.1978). In comparing the complaint and the policy, "if coverage is in doubt, the insurance company must defend." *Church Schools,* 645 F.Supp. at 631. However, if it is clear that an insurance company would not be liable under its contract for any judgment based upon the assertions in the underlying complaint, it has no obligation to defend. *Obenshain,* 245 S.E.2d at 249.

Under the terms of the policies in this case, coverage exists only if "the 'bodily injury' ... is caused by an 'occurrence' that takes place in the coverage territory." (J.A. at 149, 398.) Thus, the complaint must state a cause of action that includes a "bodily injury" [FN2] caused by an "occurrence." Under Virginia law,[FN3] the terms "accident" and "occurrence" are synonymous and "refer to an incident that was unexpected from the viewpoint of the insured." *Utica Mutual Ins. Co. v. Travelers Indem. Co.,* 223 Va. 145, 286 S.E.2d 225, 226 (Va.1982). Intentional acts are neither occurrences nor accidents, so allegations based upon such conduct are not covered by the policy. *Id.; see West Am. Ins. Co. v. Bank of Isle of Wight,* 673 F.Supp. 760, 765 (E.D.Va.1987) (term "occurrence" limits coverage to damages arising from "mistake or carelessness" and not from "intentional or reckless acts"). Likewise, claims of agency liability, respondeat superior, and strict liability for the intentional acts of an agent do not impose a duty to defend. *Church Schools,* 645 F.Supp. at 633 (allegations of intentional torts by employee do not impose duty to defend under "occurrence" language of employer's insurance policy). However, allegations that the insured or its agent negligently, carelessly, or accidentally caused bodily injury would trigger the policy's coverage. *See id.*

FN2. Virginia courts have not interpreted the term "bodily injury," but other courts have found that such language covers physical injury to the body and not purely non-physical or emotional harm. *American and Foreign Ins. Co. v. Church Schools,* 645 F.Supp. 628, 631 (E.D.Va.1986). Moreover, allegations of physical or bodily contact does not necessarily imply bodily injury. *Id.*

FN3. The parties have agreed that Virginia law would apply to this appeal.

C.

**\*4** The parties' arguments focus on the interpretation of Count IV of Nelson's complaint.[FN4] In that count, entitled "SEXUAL HARASSMENT, HOSTILE WORK ENVIRONMENT (AGAINST NATIONAL FRUIT)," Nelson asserts the following:

FN4. Because Count V of Nelson's complaint alleged that NFP engaged in intentional sexual discrimination and wrongful conduct, it clearly is not covered by the insurance contracts. In Count II, Nelson contended that NFP is liable for Mortensen's *quid pro quo* sexual harassment under an agency theory. Allegations of agency liability for an employee's intentional conduct do not invoke the defendants' duty to defend or indemnify under the contracts. Realizing the futility of a claim based upon either Count II or Count V, NFP has focused its argument upon Count IV of Nelson's claim. Accordingly, the Court will do the same.

46. Defendant Mortensen was National Fruit's plant manager and chief executive officer at its Kent City facility, and, as such, was National Fruit's agent.

178 F.3d 1285, 1999 WL 270033 (C.A.4 (Va.))
**(Table, Text in WESTLAW), Unpublished Disposition**
**(Cite as: 178 F.3d 1285, 1999 WL 270033 (C.A.4 (Va.)))**

47. As National Fruit's plant manager and chief executive officer of its Kent City facility, National Fruit delegated authority and empowered defendant Mortensen to act in the capacity of plant manager.

48. Defendant Mortensen threatened, intimidated and coerced the plaintiff into keeping silent about his sexual harassment and sexual assaults, claiming, among other things, that he knew the top company official, Verlis Miller, and that he was friends with the local law enforcement personnel and other local authorities.

49. Because of defendant Mortensen's position as chief executive officer and because of his threats and acts of intimidation, any sexual harassment policy maintained by defendant National Fruit was meaningless, and it would have been futile for the plaintiff to have reported defendant Mortensen's sexual harassment and sexual assaults.

50. Defendant National Fruit created a cultural climate which facilitated and fostered a hostile work environment and which emboldened persons such [as] defendant Mortensen to make unwelcome sexual advances, engage in acts of sexual harassment, and commit acts of sexual assault.

51. As a result of defendant Mortensen's sexual harassment, plaintiff has suffered termination of employment, economic loss in the form of back pay, front pay and lost fringe benefits.

52. As a result of defendant Mortensen's actions, plaintiff has suffered severe mental anguish, embarrassment, humiliation, pain and suffering, and severe emotional distress.

(J.A. 171-72.) NFP claims that because Count IV does not contain any allegations of intentional acts by NFP, Nelson was asserting that NFP negligently allowed a hostile work environment to develop. In sup-

port of this position, NFP relies upon this Court's opinion in *Reinhold v. Virginia,* 135 F.3d 920 (4th Cir.), *vacated,* 151 F.3d 172 (4th Cir.1998), in which it was stated that the standard for holding an employer liable for an employee's sexual harassment was whether "the employer knew or should have known of the illegal conduct and failed to take prompt and adequate remedial action." *Id.* at 929 (quoting *Andrade v. Mayfair Management, Inc.,* 88 F.3d 258, 261 (4th Cir.1996)).[FN5] NFP argues that given the "should have known" standard for liability, the unintentional creation of a hostile work environment is unexpected from the perspective of the insured and akin to a negligence action. As such, an allegation of "negligent" creation of a hostile work environment satisfies the "occurrence" requirement and triggers the indemnity and defense provisions in the insurance contracts.

FN5. In the opinion vacating the original *Reinhold* decision, this Court found that after the Supreme Court's holdings in *Faragher v. City of Boca Raton,* 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998), and *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998), the "knew or should have known" standard was no longer applicable. *Reinhold,* 151 F.3d at 174-75. Under the new standard, if sexual harassment of an employee by a supervisor results in a "tangible employment action," the employer "is liable for the harassment, regardless of whether the employer knew or should have known of the harassment." *Id.* (*citing Faragher,* 524 U.S. at ----, 118 S.Ct. at 2292; *Ellerth,* 524 U.S. at ----, 118 S.Ct. at 2270). With respect to allegations of an actionable hostile environment based upon sex, the employer is vicariously liable for the acts of its supervisor unless the employer can prove by a preponderance of the evidence that (1) the employer exercised reasonable care to prevent and correct the of-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

178 F.3d 1285, 1999 WL 270033 (C.A.4 (Va.))

**(Table, Text in WESTLAW), Unpublished Disposition**
**(Cite as: 178 F.3d 1285, 1999 WL 270033 (C.A.4 (Va.)))**

fensive conduct; and (2) the employee un-
reasonably failed to take advantage of any
preventive or corrective opportunities pro-
vided by the employer. *Id.* at 175 (*citing
Ellerth,* 524 U.S. at ----, 118 S.Ct. at 2270).

END OF DOCUMENT

**\*5** We disagree. The complaint does not allege
that NFP acted negligently in breach of a duty owed
to Nelson, nor does it allege negligence by Morten-
sen. Indeed, the complaint is remarkably void of the
type of "knew or should have known" language that
would put the defendants on notice that Nelson's
claim might sound in negligence. Rather, Count III of
the complaint alleged only intentional conduct by
Mortensen and Count IV-the claim against NFP-
alleged liability on agency theories based solely upon
those intentional acts.[FN6] Thus, it was clear that the
claims set forth in Nelson's complaint were not cov-
ered by the policies and the defendants therefore had
no duty to defend or indemnify NFP. *See Church
Schools,* 645 F.Supp. at 631; *Obenshain,* 245 S.E.2d
at 249.

> FN6. Specifically, paragraph 46 refers to
> Mortensen as NFP's agent, paragraph 47
> discusses Mortensen's authority as plant
> manager and C.E.O. of the Kent City facili-
> ty, and paragraphs 51 and 52 state that the
> claim is based upon the actions of Morten-
> sen, which were unquestionably intentional.

### III.

For the reasons stated above, we affirm the dis-
trict court's entry of summary judgment in favor of
the defendants.

*AFFIRMED*

C.A.4 (Va.),1999.
National Fruit Product Co., Inc. v. Fireman's Fund
Ins. Co.
178 F.3d 1285, 1999 WL 270033 (C.A.4 (Va.))

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.