## RECORD NO. 14-2254

### IN THE

# United States Court of Appeals

## FOR THE FOURTH CIRCUIT

LIBERTY UNIVERSITY, INCORPORATED,

*Plaintiff-Appellee,*

v.

CITIZENS INSURANCE COMPANY OF AMERICA;
HANOVER AMERICAN INSURANCE COMPANY;
HANOVER INSURANCE COMPANY,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
AT LYNCHBURG

### RESPONSE BRIEF OF APPELLEE
### LIBERTY UNIVERSITY, INCORPORATED

Harold E. Johnson
Calvin W. Fowler, Jr.
WILLIAMS MULLEN
200 South 10th Street
P. O. Box 1320
Richmond, Virginia 23218-1320
(804) 420-6000
wfowler@williamsmullen.com
hjohnson@williamsmullen.com

*Counsel for Appellee*
*Liberty University, Incorporated*

February 12, 2015

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. _14-2254_    Caption: _Liberty University, Inc. v. Citizens Ins. Co. of America, et al._

Pursuant to FRAP 26.1 and Local Rule 26.1,

_Liberty University, Inc._
(name of party/amicus)

_____

who is _____Appellee_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.  Is party/amicus a publicly held corporation or other publicly held entity? ☐ YES ☑ NO

2.  Does party/amicus have any parent corporations? ☐ YES ☑ NO
    If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3.  Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity? ☐ YES ☑ NO
    If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?  ☐ YES ☑ NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐ YES ☑ NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐ YES ☑ NO
    If yes, identify any trustee and the members of any creditors' committee:

Signature: /s/ Calvin W. Fowler, Jr., Esq.                    Date:  November 17, 2014

Counsel for: Appellee

## CERTIFICATE OF SERVICE
***************************

I certify that on  November 17, 2014  the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

Thomas S. Garrett, Esquire
HARMAN, CLAYTOR, CORRIGAN & WELLMAN
P.O. Box 70280
Richmond, VA 23255
tgarrett@hccw.com

John P. Malloy, Esquire
ROBINSON & COLE LLP
280 Trumbull Street
Hartford, CT 06103-3597
jmalloy@rc.com

/s/ Calvin W. Fowler, Jr., Esq.                    November 17, 2014
(signature)                                        (date)

# TABLE OF CONTENTS

Page

COPORATE DISCLOSURE

TABLE OF AUTHORITIES ................................................................. iii

JURISDICTIONAL STATEMENT ....................................................... 1

STATEMENT OF THE ISSUE .............................................................. 1

STATEMENT OF THE CASE ............................................................... 1

SUMMARY OF ARGUMENT .............................................................. 1

ARGUMENT ......................................................................................... 5

   I.     APPLICABLE LAW AND STANDARD OF REVIEW ........................ 5

       A. Virginia Law Governing an Insurer's Duty to Defend ........................ 6

       B. Virginia Law Governing the Construction of an Insurance Policy ....... 7

   II.    HANOVER HAS A DUTY TO DEFEND LIBERTY UNDER
       COVERAGE A OF THE POLICY ........................................... 9

       A. The Jenkins Complaint Alleges "Bodily Injury." ............................... 9

       B. The Jenkins Complaint Alleges "Property Damage." ........................ 12

       C. The Jenkins Complaint Alleges an "Occurrence." ............................. 14

           1.     Liberty had no reason to anticipate that Lisa Miller would
                abscond with Isabella ............................................... 15

           2.     Hanover's arguments run counter to Virginia law, distort the
                allegations in the Jenkins Complaint, and mischaracterize
                the District Court's ruling ........................................ 18

3. The "separation of insureds" provision in the policy means that intentional conduct by Liberty's alleged agents cannot be imputed to Liberty ................................................................27

4. Hanover mischaracterizes the District Court's ruling regarding a potential negligence claim ......................................31

D. The "Expected or Intended Injury" Exclusion Does Not Relieve Hanover of Its Duty to Defend ................................................34

III. HANOVER HAS A DUTY TO DEFEND LIBERTY UNDER COVERAGE B OF THE POLICY ...........................................................36

A. The Exclusions Cited by Hanover Are Contrary to the Grant of Coverage for "Personal and Advertising Injury." ...............................37

B. The Exclusions Cited by Hanover Do Not Apply Because the Jenkins Complaint Does Not Allege Knowing or Criminal Conduct "Committed by or at the Direction of" Liberty ..................................41

1. The allegations against Liberty do not implicate the "Knowing Violation" exclusion..................................................41

2. The allegations against Liberty do not implicate the "Criminal Acts" exclusion .......................................................45

IV. HANOVER HAS A DUTY TO DEFEND LIBERTY UNDER THE SCHOOL AND EDUCATORS LEGAL LIABILITY COVERAGE OF THE POLICY ...................................................................................48

A. The Jenkins Complaint Alleges Covered "Wrongful Acts." ..............48

B. The Criminal Acts Exclusion in the SELL Endorsement Does Not Eliminate Hanover's Duty to Defend....................................................53

CONCLUSION ........................................................................................56

CERTIFICATE OF COMPLIANCE WITH RULE 32(a) ......................................57

CERTIFICATE OF FILING AND SERVICE ........................................................58

# TABLE OF AUTHORITIES

## CASES

Page

*AES Corp. v. Steadfast Ins. Co.*,
    283 Va. 609, 725 S.E.2d 532 (2012) .......................................*passim*

*Am. Reliance Ins. Co. v. Mitchell*,
    238 Va. 543, 385 S.E.2d 583 (1989) ...............................................8

*Bentley Funding Group, L.L.C. v. SK&R Group, L.L.C.*,
    269 Va. 315, 609 S.E.2d 49 (2005) ........................................11, 39

*Capano Management Co. v. Transcontinental Ins. Co.*,
    78 F. Supp. 2d 320 (D.Del.1999) .......................................21, 43, 44

*City of Chesapeake v. State Self-Insurers Risk Retention Group, Inc.*,
    271 Va. 574, 628 S.E.2d 539 (2006) ...................................7, 12, 30

*Combs v. Hunt*,
    140 Va. 627, 125 S.E. 661 (1925) .................................................8

*D.C. McClain, Inc. v. Arlington County*,
    249 Va. 131, 452 S.E.2d 659 (1955) .............................................8

*Fuisz v. Selective Ins. Co. of America*,
    61 F.3d 238 (1995) .................................................................*passim*

*Hill v. State Farm Mutual Auto. Ins.*,
    237 Va. 148, 375 S.E.2d 727 (1989) ...................................7, 10, 38

*IFCO Sys. N. Am., Inc. v. Am. Home Assur. Co.*,
    502 F. App'x 342 (4th Cir. 2013) .......................................28, 30, 35

*Jefferson-Pilot Fire & Casualty Co. v. Boothe, Prichard & Dudley*,
    638 F.2d 670 (1980) .............................................................21, 43

*Liberty Life Ins. Co. v. Commercial Union Ins. Co.*,
    857 F.2d 945 (1988) .............................................................40, 53

*Northern Sec. Ins. Co. v. Connors*,
   161 N.H. 645, 20 A.3d 912 (2011) ....................................................21

*Nationwide Mut. Fire Ins. Co. v. Overstreet*,
   568 F. Supp. 2d 638 (E.D. Va. 2008) ............................................20

*Ocean Accident & Guar. Corp. v. Washington Brick & Terra Cotta Co.*,
   148 Va. 829, 139 S.E. 513 (1927) ..................................................12

*Pennsylvania Nat. Mutual Cas. Ins. Co. v. Block Roofing Corp.*,
   754 F. Supp. 2d 819 (E.D. Va., 2010) ........................................6, 37

*Premier Pet Products, LLC v. Travelers Property Cas. Co.*,
   678 F. Supp. 2d 409 (E.D. Va. 2010) ..................................10, 18, 32

*Res. Bankshares Corp. v. St. Paul Mercury Ins. Co.*,
   407 F.3d 631 ((4th Cir. 2005) ........................................6, 12, 22, 52

*Roughton Pontiac Corp. v. Alston*,
   236 Va. 152, 372 S.E.2d 147 (1988) ..............................................23

*TRAVCO Ins. Co. v. Ward*,
   715 F. Supp. 2d 699 (E.D. Va. 2010) ..............................................6

*Transcontinental Ins. Co. v. Caliber One Indem. Co.*,
   367 F. Supp. 2d 994 (E.D. Va. 2005) ..........................19, 20, 32, 53

*Travelers Indem. Co. v. Sterling Wholesale, LLC*,
   2013 WL 3816736 (E.D. Va. 2013) ....................................7, 18, 34

*Travelers Prop. Cas. Co. of Amer. v. Mericle*,
   486 Fed. Appx. 233 (3rd Cir. 2012) ..........................................43, 44

*United Services Auto Ass'n v. Webb*,
   235 Va. 655, 369 S.E.2d 196 (1988) ....................................8, 30, 41

*Virginia Elec.& Power Co. v. Northbrook Prop. & Cas. Ins. Co.*,
   252 Va. 265, 475 S.E.2d 264 (1996) ..........................................7, 17

*West Bend Mut. Ins. Co. v. Crichton*,
  319 F. Supp. 2d 887 (N.D. Ill. 2004)................................................38

## STATUTES

*Virginia Code § 18.2-47* ........................................................40

## RULES

Fed. R. Civ. P. 12(b)(6)....................................................24, 27

## OTHER AUTHORITIES

Black's Law Dictionary (9th ed., 2009) ........................................11, 35

Courtney Cahill, *The Genuine Article: A Subversive Economic Perspective on The Law's Procreationist Vision of Marriage*, 64 Wash. & Lee L. Rev. 393 (2007) ........................................................50

Kathryn L. Marshall, *Strategic Pragmatism or Radical Idealism?: The Same-Sex Marriage and Civil Rights Movements Juxtaposed,* 2 Wm. & Mary Pol'y Rev. 194 (2010) ........................................................50

Matthew Farley, *Challenging Supremacy: Virginia's Response to The Patient Protection and Affordable Care Act*, 46 U. Rich. L. Rev. 37 (2010) ....... 50

Nelson Lund, *Same-Sex Marriage in the Courts of Law and Reason*, 14 Engage: J. Federalist Soc'y Prac. Groups 16 (2013)........................................50

W. Bradley Wendel, *Civil Obedience,* 104 Colum. L. Rev. 363 (2004)................50

William Eskridge, Jr., *A History of Same Sex Marriage,* 79 Va. L. Rev. 1419 (1993) ........................................................50

William H. Simon, *Should Lawyers Obey the Law?*, 38 Wm. & Mary L. Rev. 217 (1996). ........................................................50

*http://www.law.virginia.edu/html/academics/clinic.htm* ........................................51

*http://law.wm.edu/academics/programs/jd/electives/clinics/index.php* ................51

*http://law.richmond.edu/ academics/clinical-programs/index.html*.........................51

*http://law.wlu.edu/clinics/*............................................................................51

## JURISDICTIONAL STATEMENT

Liberty University, Inc. ("Liberty") incorporates the jurisdictional statement set forth by Defendants-Appellants (collectively, "Hanover") in the Opening Brief of Appellants (Hanover Brief") as if set forth fully herein.

## STATEMENT OF THE ISSUE

Liberty incorporates the Statement of the Issue in the Opening Brief of Appellants as if set forth fully herein.

## STATEMENT OF THE CASE

Though Hanover takes some liberties with characterizing specific allegations in the Jenkins Complaint and rulings in the District Court's Opinion, Liberty does not believe it is necessary to engage in any further recitation of the facts or procedural history. However, Liberty notes it is the actual allegations in the Complaint filed in Vermont by Janet Jenkins ("Jenkins Complaint"), and not Hanover's paraphrasing of those allegations, that control this Court's analysis of Hanover's duty to defend Liberty.

## SUMMARY OF ARGUMENT

Under the de novo standard of review, this Court should affirm the District Court's ruling that Hanover has a duty to defend Liberty against the allegations in the Jenkins Complaint. Liberty demonstrated, and the District Court recognized,

that the Jenkins Complaint included various factual allegations regarding conduct by Liberty that falls within the coverage of the Policy.

Hoping to evade its coverage obligations, Hanover advances the same mistaken arguments at various points throughout its Brief. First, Hanover takes a broad brush approach to this complex coverage case, arguing essentially that any claims related to a kidnapping cannot be covered by liability insurance. In doing so, Hanover repeatedly ignores the rule under Virginia law that a duty to defend is determined by the nature of the insured's alleged conduct, not by the causes of action pled. Hanover also glosses over important language in its own Policy which requires affirmative, intentional conduct by Liberty to void Hanover's duty to defend. Finally, Hanover relies upon allegations of intentional conduct by other defendants to justify its denial of coverage even though that conduct is not attributable to Liberty under the allegations in the Jenkins Complaint, and even though Hanover's own Policy contains a "separation of insureds" provision that prevents Hanover from imputing to Liberty any intentional acts of its employees.

Coverage A: Liberty is entitled to a defense under Coverage A of the Commercial General Liability Policy issued by Hanover ("Policy") because the Jenkins Complaint alleges both "bodily injury" and "property damage" arising out of an "occurrence." Under Virginia's plain meaning rule, the allegations that Isabella was deprived of medical and dental care constitute a claim for "bodily

2

injury." Moreover, "bodily injury" is defined to include "sickness or disease," and the plain meaning of those terms embraces mental and emotional injuries. Hanover did not limit the definition of "bodily injury" in the Policy to purely physical conditions. Thus, the Jenkins Complaint alleges facts related to a "bodily injury" under Coverage A.

The Policy defines "property damage" to include the "loss of use of tangible property that is not physically injured." (JA81-82.) The Jenkins Complaint alleges that both Janet Jenkins and Isabella "have suffered…deprivation of personal property." (JA51, ¶¶ 70, 73.) Thus, the Jenkins Complaint expressly alleges "property damage" within the terms of the Policy.

Coverage A defines "occurrence" to mean an "accident." (JA81.) Under Virginia law, an "occurrence" refers to an injury that is unexpected or not reasonably anticipated from the policyholder's point of view. Even though the Jenkins Complaint pleads intentional torts, it does not plead any specific facts to show that Liberty knew or anticipated that Lisa Miller would steal Isabella away to Nicaragua. To the contrary, Liberty had no reason to know or expect that its alleged classroom instruction of students and public pronouncements regarding same-sex parental rights would result in the kidnapping of Isabella. (JA45-46, ¶47, 49.) The District Court properly held that the allegations of intentional conduct by Victoria Hyden ("Hyden") and/or other ostensible agents of Liberty cannot be

imputed to Liberty because there is no allegation that such conduct was undertaken on behalf of Liberty or within the scope of any agency relationship. Hanover's attack on the District Court for weighing the sufficiency of the agency allegations in the Jenkins Complaint is misguided. By necessity, in deciding whether a complaint alleges an accidental "occurrence," a court must weigh the allegations and determine whether they impute to the insured a subjective intent to harm or knowledge of a harmful consequence.

Moreover, as this Court has previously recognized, the "separation of insureds" clause in the Policy means that an employee's intentional conduct is not imputed to the employer. Thus, even if it were alleged that one of Liberty's agents acted intentionally, that agent's conduct would not preclude coverage for Liberty.

The District Court's alternative ruling that the facts alleged could give rise to a negligence claim is also well-founded under Virginia's Potentiality Rule.

Coverage B: There is no dispute that the Jenkins Complaint alleges a "personal and advertising injury" under Coverage B of the Policy. Hanover's reliance on the "Knowing Violation" and "Criminal Acts" exclusions is misplaced. First, those exclusions are invalid in the present context because they directly contradict the express extension of coverage in the insuring clause to "offenses" including "false arrest, detention or imprisonment." Moreover, the exclusions only apply where the insured "caused," "committed" or "directed" the violation of

4

another's rights or the relevant criminal act. The Jenkins Complaint does not allege that Liberty caused, committed or directed the kidnapping of Isabella, and thus, the exclusions are inapplicable.

<u>SELL Coverage</u>: The Jenkins Complaint premises liability against Liberty upon certain faculty members' (i) classroom instruction regarding civil disobedience, (ii) clinical representation of Lisa Miller, and (iii) public declarations regarding same-sex parental rights. (JA45-46, ¶47, 49.) These activities are typical of any law school, and they are fundamental to Liberty's operation as an educational institution. Thus, they constitute "wrongful acts" under the SELL Endorsement. Further, because such conduct is not criminal, Hanover's reliance upon the "criminal acts" exclusion in the SELL Endorsement is misplaced.

## **ARGUMENT**

## I.    **APPLICABLE LAW AND STANDARD OF REVIEW**.

The District Court's award of summary judgment is subject to de novo review on appeal. Therefore, this Court must apply the same rules governing summary judgment and contract interpretation that the District Court applied when considering the parties' cross-motions for summary judgment. The parties agree that, in reviewing the District Court's ruling, this Court is obligated to apply Virginia law with respect to an insurer's duty to defend its policyholder and with respect to the interpretation of insurance policies. (Hanover Brief, p. 23.)

5

A.    <u>Virginia Law Governing an Insurer's Duty to Defend</u>

In cases involving a liability insurer's duty to defend a lawsuit against its insured, Virginia follows the "Eight Corners Rule" which "requires a court to compare the four corners of the insurance policy against the four corners of the underlying complaint; **if any allegations may potentially be covered by the policy, the insurer has a duty to defend.**" *Pennsylvania Nat. Mut. Cas. Ins. Co. v. Block Roofing Corp.,* 754 F. Supp. 2d 819, 822-23 (E.D. Va., 2010) (citations omitted) (emphasis added); *AES Corp. v. Steadfast Ins. Co.,* 283 Va. 609, 616-17, 725 S.E.2d 532, 535 (2012).

Under Virginia's Eight Corners Rule, the policyholder bears an initial burden to establish a *prima facie* case that the complaint against it triggers a duty to defend. *Block Roofing,* 754 F. Supp. 2d at 823 (*citing TRAVCO Ins. Co. v. Ward,* 715 F. Supp. 2d 699, 706 (E.D.Va.2010)). "[T]his burden is not especially onerous since the insurer must defend unless it clearly appears from the initial pleading the insurer would not be liable under the policy contract for **any** judgment based upon the allegations." *Id., (quoting Res. Bankshares Corp. v. St. Paul Mercury Ins. Co.,* 407 F.3d 631, 636 (4th Cir. 2005) (internal quotations and citations omitted)). "If an insured carries its initial burden, the burden shifts to the insurer to prove its affirmative defenses, including the application of any policy exclusions." *Id., (citing TRAVCO Ins. Co.,* 715 F.Supp.2d at 706).

6

Notably, "an insurer's duty to defend…is broader than [the] obligation to pay, and arises whenever the complaint alleges **facts and circumstances**, some of which would, if proved, fall within the risk covered by the policy." *Virginia Elec. & Power Co. v. Northbrook Prop. & Cas. Ins. Co.,* 252 Va. 265, 268-69, 475 S.E.2d 264, 265 (1996) (emphasis added).  Thus, in assessing a duty to defend, courts look not to the causes of action asserted, but to the nature of the conduct described in the factual allegations of the complaint.  *Travelers Indem. Co. v. Sterling Wholesale, LLC,* 2013 WL 3816736 *6 (E.D. Va. 2013).  Even where certain allegations against an insured might not be covered under a liability policy, the insurer is obligated to defend its insured if **any** of the factual allegations would be covered.  *Fuisz v. Selective Ins. Co. of America*, 61 F.3d 238, 245 (1995)

> B.    <u>Virginia Law Governing the Construction of an Insurance Policy.</u>

"An insurance policy is a contract, and, as in the case of any other contract, the words used are given their ordinary and customary meaning when they are susceptible of such construction." *Hill v. State Farm Mutual Auto. Ins.,* 237 Va. 148, 152, 375 S.E.2d 727, 729 (1989).  So long as the terms are plain and clear, the contract is construed as written, without adding terms that were not included by the parties.  *City of Chesapeake v. State Self-Insurers Risk Retention Group, Inc.,* 271 Va. 574, 578, 628 S.E.2d 539, 541 (2006).  "No word or clause in the contract will be treated as meaningless if a reasonable meaning can be given to it, and there is a

presumption that the parties have not used words needlessly." *Id.*, (*quoting D.C. McClain, Inc. v. Arlington County,* 249 Va. 131, 135-36, 452 S.E.2d 659, 662 (1995)).

In reviewing insurance policies, courts in Virginia "take cognizance of the fact that the policy is prepared by the insurance company and is apt to contain stipulations and conditions, at times complicated and of doubtful meaning, placed in the contract for the protection of the company." *Combs v. Hunt,* 140 Va. 627, 634, 125 S.E. 661, 664 (1925). Therefore, if the language in an insurance policy is ambiguous or capable of more than one reasonable interpretation, it must be construed in favor of the policyholder. *United Services Auto Ass'n v. Webb,* 235 Va. 655, 657, 369 S.E.2d 196, 198 (1988). Moreover, Virginia law generally construes exclusionary language in insurance policies narrowly and in favor of the insured. The Virginia Supreme Court has held:

> Exclusionary language in an insurance policy will be construed most strongly against the insurer and the burden is upon the insurer to prove that an exclusion applies. Reasonable exclusions not in conflict with statute will be enforced, but it is incumbent upon the insurer to employ exclusionary language that is clear and unambiguous.

*Am. Reliance Ins. Co. v. Mitchell*, 238 Va. 543, 547, 385 S.E.2d 583, 585 (1989) (citations omitted).

8

## II.   HANOVER HAS A DUTY TO DEFEND LIBERTY UNDER COVERAGE A OF THE POLICY.

Hanover has a duty to defend Liberty because the Jenkins Complaint includes allegations of both "bodily injury" and "property damage" caused by an "occurrence." (JA 68-69.) Moreover, the "Expected or Intended" exclusion cited by Hanover does not obviate Hanover's duty to defend Liberty.

### A.   The Jenkins Complaint Alleges "Bodily Injury."

The Policy defines "bodily injury" to mean "bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time. 'Bodily injury' includes mental anguish or other mental injury resulting from 'bodily injury.'" (JA 63, 68.)

The District Court ruled that the Jenkins Complaint did not allege "bodily injury," and Hanover maintains that the Jenkins Complaint alleges only emotional injuries which do not qualify as "bodily injury" under the Policy. (Hanover Brief, p. 25.) However, Virginia's basic rules of contract interpretation compel a different conclusion.

First, the Jenkins Complaint alleges that Isabella "is currently being deprived of…medical and dental care…." (JA52-53, ¶ 81.) The implication of these allegations is that, as a result of being kidnapped and detained in Nicaragua, Isabella suffered detriments to her physical well-being which otherwise would have been avoided. The plaintiffs could present evidence at trial in Vermont that

9

Isabella suffers from malnutrition or has an untreated medical condition that developed or grew worse due to a lack of proper medical care in Nicaragua. Such evidence, which is in line with the allegations of the Jenkins Complaint, would obviously establish a "bodily injury." Virginia adheres to the Potentiality Rule, which "mandates that any 'potentiality' that the plaintiff's allegations may state a claim covered by the insurance policy triggers the insurance company's duty to defend." *Premier Pet Products, LLC v. Travelers Property Cas. Co.,* 678 F. Supp. 2d 409, 416 (E.D. Va. 2010). Thus, the allegations asserting a lack of medical and dental care for Isabella, potentially support a claim for "bodily injury" under the policy.

Second, the Jenkins Complaint alleges that both Isabella and Jenkins have suffered emotional distress as a result of Isabella's detention. The District Court noted that some courts have held that claims for emotional distress do not fall within the definition of "bodily injury." (JA297.) However, such precedent runs counter to Virginia's rules of policy construction.

Undefined terms in an insurance policy are given their common meaning. *Hill,* 237 Va. at 152, 375 S.E.2d at 729. Merriam Webster's defines "sickness" as, among other things, the "unhealthy condition of body or **mind**." *See, http://www.merriam-webster.com/ dictionary/ sickness (emphasis added).* Similarly, one definition provided for "disease" is "a condition that prevents the

10

body or **mind** from working normally." *See, http://www.merriam-webster.com/dictionary/disease (emphasis added).* Accordingly, the words which Hanover used to define "bodily injury" refer not only to physical maladies, but also conditions of the mind. Therefore, purely mental or emotional injuries fall within the definition of "bodily injury."

It is also worth noting that the definition of "bodily injury" in the Policy contains no language limiting the scope of the term to purely physical injuries. The omission of language which could have been inserted in a written contract can be just as important in deciding the parties' intent as the language that they chose to include. *Bentley Funding Group, L.L.C. v. SK&R Group, L.L.C.*, 269 Va. 315, 330, 609 S.E.2d 49, 56 (2005). Hanover's definition of "bodily injury" does not exclude emotional injuries, nor does it even use the word "physical" to limit the scope of the term in any way. By contrast, Black's Law Dictionary defines "bodily injury" to mean "**physical** damage to a person's body." *Black's Law Dictionary,* (9th ed., 2009) (emphasis added).

If Hanover actually meant to limit its definition of "bodily injury" to purely physical injuries, then it should have used language to that affect. In fact, that is precisely what Hanover did elsewhere in the Policy by defining "property damage" as "**physical injury** to tangible property." (JA 81-82) (emphasis added). The incorporation of a physical injury limitation into the definition of "property

damage" highlights the absence of such a limitation in the Policy's definition of "bodily injury." Interpreting the definition of "bodily injury" as applying only to physical injuries would add terms to the definition that were not included by the parties, violating longstanding Virginia law regarding the interpretation of insurance policies. *City of Chesapeake,* 271 Va. at 578, 628 S.E.2d at 541.

Virginia law construes the language in an insurance policy strictly against the insurer and in favor of the policyholder. *Resource Bankshares Corp. v. St. Paul Mercury Ins. Co.,* 407 F. 3d 631, 636 (2005) ("Because insurance companies typically draft their policies without the input of the insured, the companies bear the burden of making their contracts clear.") In cases of doubt, the language in a policy "should be construed most strongly against the insurer." *Ocean Accident & Guar. Corp. v. Washington Brick & Terra Cotta Co.,* 148 Va. 829, 139 S.E. 513, 517 (1927). Thus, to the extent there is any doubt as to whether the definition of "bodily injury" includes (i) the types of physical detriments alleged on behalf of Isabella; and/or (ii) the mental injuries suffered by both Isabella and Jenkins, the Court must rule in favor of coverage.

B.     The Jenkins Complaint Alleges "Property Damage."

The Policy's definition of "property damage" includes not only physical damage to property, but also "[l]oss of use of tangible property that is not physically injured." (JA81-82.)

The Jenkins Complaint directly avers that the plaintiffs lost the use of tangible property as a result of the defendants' conduct. (JA51-53, ¶¶ 73, 79, 81.) For example, the Jenkins Complaint asserts that "Plaintiffs have suffered injury to their business or property, including legal fees, investigative fees, court costs, and unpaid child support obligations and **deprivation of personal property."** (JA51, ¶¶ 70, 73) (emphasis added).) As the District Court noted, the express allegation that Isabella "suffered a 'deprivation of personal property'… qualifies as a 'loss of use of tangible property that is not physically injured' under the Policy." (JA299.)

Ignoring these explicit allegations of property loss, Hanover accuses the District Court of "speculat[ing] about possible additional allegations that might be made" regarding Isabella's loss of use of "books, toys and clothing." (Hanover Brief, p. 26.) This argument misstates the District Court's opinion. The District Court did not opine that the Jenkins Complaint specifically alleged Isabella lost "toys, books and clothing." Rather, the District Court recognized that, under Virginia's Potentiality Rule, the explicit allegation of "deprivation of personal property" would allow the plaintiffs to present evidence regarding – and seek damages for – the loss of use of specific items "like books, toys, clothing and other material goods." (JA299.) The District Court's reference to specific items was merely illustrative.

Hanover also mischaracterizes the allegations in the Jenkins Complaint. Citing the prayer for relief, Hanover avers that "even if the Jenkins Complaint alleges 'property damage,' it does not seek *damages because of* 'property damage.'" (Hanover Brief, p. 27.) This is false. First, the Jenkins Complaint specifically alleges "deprivation of personal property" in two separate counts of the complaint, clearly indicating the intent to present evidence and pursue relief for the loss of use of such personal property. (JA51, ¶¶70, 73). Second, the prayer for relief in the Jenkins Complaint specifically alleges that the defendants' conduct caused "damage and injury to [Janet Jenkins'] business and property" (JA52, ¶79). It also cites Isabella's poor "standard of living" and concludes that the detention of Isabella in Nicaragua "currently and will in the future result in an injury to Isabella's property." (JA52-53, ¶¶80-81.) The Jenkins Complaint plainly and explicitly seeks damages for alleged "property damage" within the terms of the Policy.

C.    The Jenkins Complaint Alleges an "Occurrence."

To be covered, the claims for "bodily injury" or "property damage" against Liberty must arise out of an "occurrence." (JA68.) The Policy defines "occurrence" to mean "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (JA81.)

In a recent case examining this definition, the Virginia Supreme Court explained that "the terms 'occurrence' and 'accident' are synonymous and…refer to an incident that was unexpected **from the viewpoint of the insured**." *AES*, 283 Va. at 617, 725 S.E.2d at 536 (*citations omitted*) (*emphasis added*). The Supreme Court continued:

> [T]he dispositive issue in determining whether an accidental injury occurred is not whether the action undertaken by the insured was intended, but rather whether the resulting harm is alleged to have been reasonably anticipated or the natural or probable consequence of the insured's intentional act.

*Id.,* at 618, 725 S.E.2d at 536.

Thus, the question here is whether the Jenkins Complaint alleges intentional acts by Liberty that, from Liberty's own viewpoint, would naturally or probably lead to the "bodily injuries" and "property damage" allegedly suffered by the plaintiffs. So long as Liberty did not reasonably anticipate that its conduct would cause the alleged injuries to Isabella and Jenkins, the allegations in the Jenkins Complaint constitute an "occurrence" under the Policy.

1. *Liberty had no reason to anticipate that Lisa Miller would abscond with Isabella.*

Liberty is entitled to a defense from Hanover because the Jenkins Complaint does not allege facts from which one would reasonably conclude that the detention of Isabella was expected **from Liberty's viewpoint**. While the kidnapping may

15

not have been an accident for some of the defendants, Jenkins does not allege facts to show that Liberty (or any of its authorized representatives) actively participated in the kidnapping of Isabella. There is not even any conclusory allegation that Liberty anticipated Lisa Miller would flee the country with Isabella. To the contrary, the Jenkins Complaint notes that Lisa Miller's attorneys (and Liberty's professors) "have at all times maintained that they did not know their client's location to various courts in Vermont…and Virginia, and to the press that she simply stopped communicating with them and disappeared." (JA47, ¶58.)

Unable to point to any specific acts undertaken by Liberty to assist Lisa Miller's flight to Nicaragua, the Jenkins Complaint alleges an indirect theory of liability against Liberty. Citing Liberty's (i) legal representation of Miller; (ii) instruction of its law school students regarding civil disobedience; and (iii) public pronouncements regarding same sex parental rights (JA45-46, 48, ¶¶ 47, 49, 60), the Jenkins Complaint alleges that Liberty is liable under *respondeat superior* principles and that Liberty **ratified** the conduct of other defendants through its teachings. (Id., ¶49.) By advancing this theory, the Jenkins Complaint asserts a theory of liability against Liberty which is not premised upon any intentional and/or active participation by Liberty in the plot to kidnap Isabella. Rather,

Jenkins avers that Liberty is liable because of its employees' alleged support of Lisa Miller and their public opposition to same-sex marriage and custodial rights.[1]

Liberty could never reasonably expect that its clinical representation of a woman in a custody dispute, its instruction of law students about civil disobedience, or its public critiques of the same-sex family model would lead directly to the kidnapping of a young girl by her biological mother. Therefore, from Liberty's viewpoint, any alleged injuries arising out of the authorized conduct of Liberty's agents (such as the alleged representation of Miller and the instruction regarding civil disobedience) were purely accidental and constitute an "occurrence" under the Policy.

This is particularly true with respect to Isabella. A clear inference may be drawn from the allegations in the Jenkins Complaint that in representing Lisa Miller and publicly opposing same-sex parenting rights, Liberty (rightly or wrongly) acted in what it perceived to be Isabella's best interest. One may disagree with Liberty's position on such matters, but that does not mean that

---

[1] Even if the Jenkins Complaint asserted intentional conduct by Liberty, the affirmative allegation that Liberty is liable for its alleged legal representation of Miller and instruction of its students presents an alternative theory of recovery which is a covered "occurrence" and which triggers Hanover's duty to defend. Again, only **some** of the allegations must be covered in order to trigger the duty to defend. *Virginia Elec. & Power Co.,* 252 Va. at 268-69, 475 S.E.2d at 265.

17

Liberty expected or intended to harm Isabella in any way. Rather, any alleged injury to Isabella was clearly unintended from Liberty's viewpoint.

> 2.    *Hanover's arguments run counter to Virginia law, distort the allegations in the Jenkins Complaint, and mischaracterize the District Court's ruling.*

Hanover argues that the Jenkins Complaint does not allege an "occurrence" because the intentional acts of Victoria Hyden and other individuals affiliated with Liberty are imputed to Liberty under principles of vicarious liability. (Hanover Brief, pp. 30-36.) Pointing to the causes of action pled in the Jenkins Complaint, Hanover further avers that Liberty is only accused of intentional torts, and such torts cannot be an "occurrence." (Id.) Hanover also accuses the District Court of improperly applying a Rule 12(b)(6) standard and weighing the sufficiency of the allegations in the Jenkins Complaint as though it were deciding the validity of plaintiffs' claims against Liberty. (Id.) Hanover's arguments on these points are flawed.

First, Hanover's arguments are not in concert with Virginia law. In focusing on the causes of action pled, Hanover contravenes the rule in Virginia that "the Court considers not the nominal claims asserted by the plaintiffs in the underlying lawsuit, but the particular acts alleged." (*Travelers Indem. Co. v. Sterling Wholesale, LLC,* 2013 WL 3816736 *6 (E.D. Va. 2013).) *See also, Premier Pet Products, LLC v. Travelers Property Cas. Co.,* 678 F. Supp. 2d 409, 416 (E.D. Va.

18

2010) ("The nature of the policyholder's conduct trumps the form of the action pleaded, requiring the insurance company to defend if any allegations *potentially* state a claim covered by the policy.") (citation omitted); *Transcontinental Ins. Co. v. Caliber One Indem. Co.,* 367 F. Supp. 2d 994, 1004 (E.D. Va. 2005) ("Accordingly, these courts look to the nature of the act the insured is alleged to have committed i.e., intentional or unintentional, rather than to the form of action pleaded to determine whether coverage and/or a duty to defend exists."). Confirming this rule, the Virginia Supreme Court recently reiterated that the duty to defend "arises whenever the complaint alleges **facts and circumstances** [not causes of action], some of which would, if proved, fall within the risk covered by the policy." *AES Corp.,* 283 Va. at 617, 725 S.E.2d at 535 (citation omitted) (emphasis added).

There is sound logic underlying the focus on factual allegations instead of causes of action asserted. The rule reflects the reality that a policyholder, who purchases insurance to guard against liability caused by its conduct, cannot control the way in which an aggrieved claimant structures the claims in his/her pleading. The parties to an insurance contract agree at the outset that certain types of conduct will or will not be covered, and they do so without any reference to what legal

actions might be asserted based on that conduct.[2]  Thus, it makes sense that the nature of the conduct alleged, and not the actual counts asserted, should determine whether coverage is available or excluded.  Not surprisingly, this logic has been upheld in Virginia and elsewhere.  *Transcontinental Ins. Co.*, 367 F.Supp.2d at 1003 (citing cases from other jurisdictions) (noting that the focus on an insured's conduct instead of the nature of claims asserted is "supported by the commonsense proposition that an insured purchases professional liability insurance 'to protect it[self] from its own failures' and cannot readily control whether it is sued for those failures in tort or contract.")

Notably, this rule cuts both ways, and it is often the insurance carrier who beseeches the court to examine the specific facts alleged, and not the causes of action pled, to ascertain whether there is a duty to defend.  *AES Corp.,* 283 Va. at 537-38, 725 S.E.2d at 620-21(assertion of negligence did not trump the specific facts alleging that the defendants acted intentionally with knowledge of the likely harmful results of their conduct); *see also Nationwide Mut. Fire Ins. Co. v. Overstreet,* 568 F.Supp.2d 638, 651-52 (E.D. Va. 2008) (insurer successfully

---

[2] For example, the Policy does not exclude specific counts asserting assault and battery, fraud, abuse, or other intentional torts.  Rather, it excludes claims for "'bodily injury' or 'property damage' expected or intended from the standpoint of the insured." (JA69.)  The focus of the Policy itself is on the nature of the insured's conduct, not the formal causes of action an aggrieved claimant chooses to assert based on that conduct.

argued that cause of action for gross negligence did not trigger duty to defend where the facts alleged intentional sexual abuse.)

Thus, the fact that the Jenkins Complaint asserts claims for conspiracy or other intentional torts is immaterial.[3]  It is the nature of the conduct described in the specific allegations against Liberty that determines whether a duty to defend exists.  As set forth above, the only allegations directly related to Liberty involve its faculty's (i) legal representation of Lisa Miller, (ii) classroom instruction regarding civil disobedience and (iii) public pronouncements in the debate over parental rights of same-sex parents.  (JA 45-46, 48, ¶¶47, 49, 60.)  Lisa Miller's decision to flee with Isabella to Nicaragua is not a "natural and probable consequence" of Liberty's involvement in the political, societal and legal debate over the parental rights of same-sex couples.  *AES Corp.,* 283 Va. at 618, 725 S.E.2d at 536.  To the extent Liberty's conduct in this regard caused an injury to

---

[3] Even if the causes of action pled were material, courts have found a duty to defend where conspiratorial conduct is alleged.  *Jefferson-Pilot Fire & Casualty Co. v. Boothe, Prichard & Dudley*, 638 F.2d 670 (1980) (Allegations of antitrust conspiracy were covered by law firm's professional liability policy under Virginia law); *Northern Sec. Ins. Co. v. Connors,* 161 N.H. 645, 20 A.3d 912 (2011) ("We conclude that an insured would reasonably expect that if there is coverage for false imprisonment, there is also coverage for conspiracy to commit false imprisonment."); *Capano Management Co. v. Transcontinental Ins. Co.,* 78 F.Supp. 2d 320, 331–32 (D.Del.1999) ("Because there is a duty to defend the underlying wrong ... there is a corresponding duty to defend the civil conspiracy claim.").

Isabella and/or Jenkins, that injury is a covered "occurrence" under the Policy regardless of the legal causes of action asserted.

Hanover's argument also ignores the principle that only some of the allegations in a complaint need to be covered to trigger an insurer's duty to defend. *Resource Bankshares Corp. v. St. Paul Mercury Ins. Co.,* 407 F.3d 631, 636 (4th Cir. 2005) (the duty to defend "arises whenever the complaint alleges facts and circumstances, **some of which**¸ if proved, would fall within the risk covered by the policy.") (*emphasis added*); *Fuisz v. Selective Ins. Co. of America*, 61 F.3d 238, 245 (1995) ("Where both covered and excluded acts are alleged, the duty to defend attaches."). Thus, the question is not whether any allegations in the Jenkins Complaint are excluded, but whether any of the allegations potentially would be covered.

In disregard of this principle of law, Hanover entirely discounts Jenkins' allegations setting out a theory of liability based solely upon Liberty's teachings and public opposition to same-sex parental rights. Even if the alleged intentional conduct of Victoria Hyden could be imputed to Liberty, the Jenkins Complaint advances an alternative theory against Liberty based upon the acts of other agents who are not alleged to have known that Lisa Miller planned to flee with Isabella. Because this alternative theory does not accuse Liberty of knowing participation in

the scheme to kidnap Isabella, it triggers Hanover's duty to defend regardless of any other allegations set forth in the complaint.

Second, Hanover's assertion that the conduct of any individuals affiliated with Liberty must be imputed to Liberty is incorrect. Vicarious liability requires not just the existence of an agency relationship, but allegations that the actionable conduct was undertaken within the scope of the agency relationship. *Roughton Pontiac Corp. v. Alston,* 236 Va. 152, 155, 372 S.E.2d 147, 149 (1988). Just because an individual is alleged to be an agent of Liberty does not mean that the individual acted in furtherance of Liberty's interest or at Liberty's direction. Nor does it mean that all of the agent's conduct may be imputed to Liberty.

This principle is important here because, while the Jenkins Complaint alleges that Victoria Hyden assisted in arranging transportation for Miller's trip to Nicaragua, it does not plead facts to show that Hyden did so **on behalf of Liberty**. (JA44, ¶41). Nor are the allegations cited by Hanover regarding donations by Jerry Falwell, Jr. (JA42, ¶27) or the soliciting of donations by Rena Lindevaldsen (JA44-45, ¶43) attributable to Liberty. The Jenkins Complaint does not allege such conduct was undertaken on Liberty's behalf or at Liberty's direction.

In fact, the District Court of Vermont ("Vermont Court") confirmed this point when it dismissed Liberty from the Jenkins Complaint on jurisdictional grounds because there were no allegations of intentional conduct attributable to

23

Liberty. (JA228-230.) The Vermont Court found that, although the Jenkins Complaint contains conclusory allegations that Victoria Hyden was Liberty's agent, it does not allege facts to establish any wrongful conduct by Ms. Hyden (or anyone else) that was within the scope of that agency relationship. (Id.) The Vermont Court specifically noted that there was "no indication that Liberty University manifested any consent that a student employee [Hyden] should act as its agent." (JA230.) Judicial consistency mandates that, because the allegations of agency were insufficient to impute conduct to Liberty for purposes of jurisdiction in Vermont, those allegations are also insufficient to impute intentional conduct to Liberty for purposes of the duty to defend here in Virginia. It would be incongruous to allow Hanover to deny coverage based upon a theory of agency that has already been discredited by the trial court presiding over the Jenkins Complaint.

Accordingly, the District Court here properly held that, with respect to allegations of intentional torts by Liberty's agents, "none of [Liberty's] employees or potential agents were factually alleged to have been acting with authorization, ratification, or within the scope of their employment for Liberty." (JA313.)

Third, Hanover mischaracterizes the District Court's opinion by equating it to a ruling on a 12(b)(6) motion to dismiss. The thrust of Hanover's argument is that the District Court had no business "weighing" the allegations of agency in the

24

Jenkins Complaint. According to Hanover, "determining whether an insurer owes a duty to defend does not depend on the sufficiency of the allegations to state a claim." (Hanover Brief, p. 33.)   Instead, Hanover avers that a court "must presume" that Liberty would be vicariously liable for Victoria Hyden's conduct.[4] (Hanover Brief, p. 34.)

Hanover ignores the fact that in addressing a duty to defend, a court necessarily must "weigh" the allegations in the complaint against the language in the policy. Indeed, that is precisely what the District Court was required to do under the recent *AES Corp.* decision. There, the Virginia Supreme Court noted:

> For coverage to be precluded under a Policy because there was no occurrence, it must be alleged that the result of an insured's intentional act was more than a possibility; **it must be alleged that the insured subjectively intended or anticipated the result of its intentional act** or that objectively, the result was a natural or probable consequence of the intentional act. Thus, resolution of the issue of whether Kivalina's Complaint alleges an occurrence covered by the policies **turns on whether the Complaint can be construed as alleging** that Kivalina's injuries, at least in the alternative, resulted from unforeseen  consequences that were not natural or probable consequences of AES's deliberate act of emitting carbon dioxide and greenhouse gases.

---

[4] Of course, this statement by Hanover begs the question: why must a court presume liability based upon a dubious allegation of agency that had already been dismissed as insufficiently pled by the presiding trial court in Vermont?

*AES Corp.,* 283 Va. at 618, 725 S.E.2d at 536 (emphasis added). Thus, a court deciding whether an injury is an accidental "occurrence" is obligated to weigh the allegations in a complaint and determine whether they are sufficient to impute to the policyholder subjective intent to harm or knowledge of a likely harmful consequence.

That is precisely the analysis the District Court undertook here. To answer the duty to defend inquiry, the District Court had to determine whether Isabella's kidnapping was "unexpected from the viewpoint of [Liberty]." *AES Corp.,* 283 Va. at 617, 725 S.E.2d at 536. This required the District Court to assess the allegations in the Jenkins Complaint to determine whether they were sufficient to impute to Liberty the intentional conduct of its ostensible agents and whether those allegations stated an "occurrence" from Liberty's viewpoint.

Hanover selectively quotes snippets of the District Court opinion out of context (JA33), but the opinion makes clear that the District Court weighed the allegations in the Jenkins Complaint solely to assess Liberty's intent under the *AES Corp.* standard:

> [T]he Jenkins Complaint alleged insufficient facts to hold Liberty vicariously liable for Hyden, Staver or Lindevaldsen's actions under agency or respondeat superior theories. The Jenkins Complaint also did not sufficiently allege that Liberty was directly liable for the intentional torts, as is required to avoid the duty to defend. The Jenkins Complaint does allege facts giving rise to a potentially covered claim under the policy: an

26

> incident that was unexpected from Liberty's viewpoint, and resulting harm that Liberty could not have reasonably anticipated. Therefore the Jenkins Complaint alleged an occurrence under the Policy. [citing Policy language and AES Corp., 725 S.E.2d at 536.]

(JA303). The latter sentences in this passage (which Hanover omitted in its Brief) make clear the context in which the District Court examined the sufficiency of the agency allegations.

The District Court did not undertake a Rule 12(b)(6) analysis or decide that coverage was appropriate because the Jenkins Complaint failed to state a claim. Rather, in keeping with *AES*, it weighed the allegations solely to determine whether the kidnapping of Isabella was unexpected from Liberty's viewpoint.

> 3. *The "separation of insureds" provision in the policy means that intentional conduct by Liberty's alleged agents cannot be imputed to Liberty.*

Even if the Jenkins Complaint properly alleged an agency relationship between Liberty and Hyden, Liberty would be entitled to a defense under the Policy's "separation of insureds" provision. Specifically, the Policy provides:

> **7. Separation of Insureds**
>
> Except with respect to the Limits of Insurance, and any rights or duties specifically assigned in this Coverage part to the first Named Insured, this insurance applies:
>   a. As if each Named Insured were the only Named Insured; and
>   b. Separately to each insured against whom claim is made or 'suit' is brought.

(JA79). The obvious purpose of this provision is to preserve coverage for an innocent insured even where another insured engages in conduct that would be excluded under the Policy.

This applies often in the agent/principal context, maintaining coverage for the innocent principal who did not authorize or direct an agent's intentional torts. In fact, the District Court quoted an unpublished opinion in which this Court explained that a separation of insureds clause:

> may require us to approach the question of coverage solely from [an employer's] perspective. Given this approach, we may conclude the thefts were 'accidents' because [the employer] neither intended nor reasonably could have foreseen that its employees would engage in intentionally tortious conduct.

(JA308) (*quoting IFCO Sys. N. Am., Inc. v. Am. Home Assur. Co.,* 502 F. App'x 342, 347 (4th Cir. 2013). The same logic applies in this case. To the extent Hyden acted within the course and scope of her employment for Liberty, she was an "insured" under the policy.[5] (JA76.) However, the plain meaning of the "separation of insureds" clause in the Policy precludes Hanover from imputing her

---

[5] Hanover's Policy defines "insured" to include Liberty's employees and "volunteer workers" "for acts within the scope of their employment…or while performing duties related to the conduct of [Liberty's[ business." (JA76.)

intentional conduct to Liberty.  Thus, the detention of Isabella remains an accident from Liberty's viewpoint.[6]

Seeking to circumvent the clear import of its own "separation of insureds" provision, Hanover argues first that the clause does not apply because Liberty is the only insured against whom a claim was asserted.  (Hanover Brief, pp. 32-35.) This is incorrect.  The only employee of Liberty who is actually alleged to have engaged in intentional conduct to assist with the kidnapping and detention of Isabella is Victoria Hyden, and she is named as a defendant in the Jenkins Complaint. (JA37, 39.)  Thus, "suit" has been brought against her, and to the extent she is alleged to have acted in the scope of her employment for Liberty, the separation of insureds clause is implicated.

Hanover next argues that the "separation of insureds" clause is at odds with Virginia law regarding vicarious liability, which "imputes the liability of the agent (Hyden) to the principal (Liberty)."     (Hanover Brief, p. 39.)   In making this argument, Hanover confuses liability and insurability.  The question is not whether

---

[6] Because the plain language of the "separation of insureds" provision is clear, there is no need to resort to other rules of contract interpretation.  However, it is worth noting that the District Court's application of that provision is in line with the various exclusions in the Policy which predicate coverage upon a specific insured's knowledge or intent.  For example, the "Expected or Intended Injury" exclusion relied upon by Hanover only excludes coverage for injuries "expected or intended from the standpoint of **the** insured [not **any** insured]**."** (JA69 (emphasis added).)  Thus, the Policy consistently distinguishes multiple insureds from one another when it comes to intentional conduct or expected injuries.

a principal may be vicariously liable for the acts of its agent. Rather, the question is whether such vicarious liability would be insured under the Policy. Nothing in Virginia law precludes an insurer from covering a principal's vicarious liability for the intentional acts of an agent. Thus, even if Hyden's intent were imputed to Liberty for purposes of establishing vicarious liability, the separation of insureds provision means that her intent is not imputed to Liberty for purposes of assessing Hanover's duty to defend. Under Hanover's argument, the "separation of insureds" clause essentially would be read out of the Policy altogether. This would contravene Virginia law holding that words in an insurance policy will not be treated as meaningless. *City of Chesapeake*, 271 Va. at 578, 628 S.E.2d at 541.

At the very least, as the District Court also noted, the provision creates an ambiguity as to whether an agent's intent is imputed to the insured principal under the policy. (JA308-309.) This Court's plain reading of the "separation of insureds" clause in *IFCO* demonstrates that a reasonable construction of the separation of insureds clause would grant coverage to an employer even where its employee acts intentionally. *United Services Auto Ass'n v. Webb,* 235 Va. 655, 657, 369 S.E.2d 196, 198 (1988).

The bottom line is that the duty to defend exists regardless of whether Hyden is alleged to have acted within the scope of her employment for Liberty. If she acted outside the scope of such employment, then her conduct is not attributable to

30

Liberty under basic principles of agency law. If her conduct was within the course of her employment, then the separation of insureds clause applies. Either way, Hanover cannot use allegations regarding Hyden's conduct to avoid its duty to defend Liberty.

4.   *Hanover mischaracterizes the District Court's ruling regarding a potential negligence claim.*

Hanover also posits that the District Court based its decision upon a claim for negligent supervision or hiring that was not pled in the Jenkins Complaint. (Hanover Brief, pp. 40-42.)  This argument distorts the District Court's opinion and runs counter to Virginia law.

First, the potential for a negligent supervision claim was only one of several grounds upon which the District Court found a duty to defend.  Before even addressing "negligent supervision," the District Court properly found that the Jenkins Complaint did not directly allege any intentional conduct by Liberty or its authorized agents in furtherance of the detention of Isabella.  Instead, and for the reasons set forth above, the Jenkins Complaint alleges facts "giving rise to a potentially covered claim under the policy: an incident that was unexpected from Liberty's viewpoint, and resulting harm that Liberty could not have reasonably anticipated." (JA303.)   The District Court also found that the "separation of insureds" provision preserved coverage for Liberty, even for the intentional torts alleged.  (JA303-309.)  As an **alternative** to those two bases for coverage, the

31

District Court pointed out that the Jenkins Complaint could also be construed as pleading facts to support a claim in negligence as a third independent basis for coverage. The District Court explained:

> **[E]ven if** the "separation of insureds" provision did not require me to separate Liberty's intent and expectations from those of its employees, and **even if** the Jenkins Complaint alleged sufficient vicarious or direct liability to bar coverage, the Jenkins Complaint alleged conduct by Liberty that creates potential liability in negligence and triggers Hanover's duty to defend.

(JA315) (emphasis added). Therefore, Hanover overstates the importance of the potential negligence claim under the facts alleged to the District Court's ultimate conclusion that Hanover had a duty to defend Liberty.

Regardless of that fact, Hanover's arguments on this point are meritless. Hanover once again focuses on the causes of action pled instead of factual allegations regarding Liberty's conduct. As set forth above, Virginia's "potentiality rule" mandates that "[t]he nature of the policyholder's conduct trumps the form of the action pleaded" when assessing an insurer's duty to defend. *Premier Pet Products, LLC,* 678 F. Supp. 2d at 416. The Potentiality Rule recognizes that parties to an insurance contract agree that certain types of conduct will be covered and others excluded, without any reference to specific causes of action that might be pled by aggrieved claimants. *Transcontinental Ins. Co.*, 367 F.Supp.2d at 1003.

Therefore, in addition to its findings regarding (i) the separation of insureds clause (JA303-08), and (ii) the absence of any allegations in the Jenkins Complaint that would impute Hyden's intentional conduct to Liberty (JA309-14), the District Court properly examined the nature of the conduct alleged and determined (iii) that the factual allegations in the Jenkins Complaint would support a claim for negligence that would be covered under the Policy.  (JA314-15.)

The District Court noted that the Federal Rules of Civil Procedure authorize the amendment of pleadings up until trial and even, in appropriate cases, after judgment is entered.  (JA319-320.)  The Rules also allow the instruction of a jury upon theories not expressly pled.  (Id.)  Thus, in keeping with the Potentiality Rule, the District Court recognized that the specific facts alleged in a complaint may lead to liability based upon a legal theory or cause of action not asserted in the complaint.   Because the facts alleged would potentially support a claim of negligence, Hanover had a duty to defend Liberty against the Jenkins Complaint.

The Jenkins Complaint succinctly sets out a theory of recovery against Liberty based not upon intentional conduct in furtherance of the kidnapping, but upon Liberty faculty's representation of Lisa Miller in the custody dispute (JA41, ¶ 22), classroom teachings related to civil disobedience (JA45, ¶47), and "public declaration[s]" in opposition to same sex parental rights. (JA46, ¶49.)  Nowhere does the Jenkins Complaint allege that Liberty knew such conduct would lead to

33

the kidnapping and detention of Isabella in Nicaragua, nor is it even alleged that Liberty should have foreseen that possibility. Rather, it is alleged that Liberty "ratified" the intentional conduct of others who perpetrated the kidnapping. (JA46, ¶49.) These facts address conduct by Liberty that falls well within the coverage of the Policy, and which led to injuries that were not anticipated, much less expected, by Liberty. Thus, the facts alleged constitute an "occurrence" under the Policy which triggers Hanover's duty to defend, regardless of the causes of action the plaintiff chose to assert.

> D.    The "Expected or Intended Injury" Exclusion Does Not Relieve Hanover of Its Duty to Defend.

Turning to the "Expected or Intended Injury" exclusion, Hanover essentially recycles its flawed arguments relating to the "occurrence" requirement under the Policy.

First, Hanover again relies on the causes of action alleged and ignores the specific factual allegations regarding Liberty's conduct. (Hanover Brief, pp. 42-44.) This contravenes Virginia's requirement that "the Court considers not the nominal claims asserted by the plaintiffs in the underlying lawsuit, but the particular acts alleged." *Sterling Wholesale, LLC,* 2013 WL 3816736 *6. The exclusion does not apply because even though intentional torts are pled, the Jenkins Complaint alleges specific conduct by Liberty (such as the teaching of

34

students and public declarations by Liberty's faculty) which would not be expected to cause the kidnapping of Isabella. (JA45, ¶47, 49.)

Moreover, the Jenkins Complaint asserts that, through this conduct, Liberty somehow **ratified** the intentional misdeeds of the other defendants. (JA45, ¶49.) Among other things, Black's Law Dictionary defines "ratification" as the "confirmation and acceptance of a previous act…" *Black's Law Dictionary* (9th Ed. 2009). Logic dictates that Liberty could not have anticipated, much less "expected or intended," conduct which it only later allegedly ratified. Even if other allegations in the Jenkins Complaint would be excluded, the duty to defend is triggered because the allegations regarding ratification do not demonstrate any expectation of injury from Liberty's viewpoint. *Fuisz*, 61 F.3d 238, 245 (1995) (noting that only some allegations must be covered to trigger a duty to defend).

Nor can Hanover rely upon allegations regarding intentional acts by Liberty's agents to implicate the "Expected or Intended Injury" exclusion. By its very language, the exclusion only applies if the injury is expected or intended "from the standpoint of the insured." (JA69.) This principle is reinforced in the language of the "separation of insureds" clause, which precludes the Court from imputing to Liberty the intentional conduct of its agents. *IFCO Sys.,* 502 F. App'x at 347.

Finally, the allegations in the Jenkins Complaint demonstrate that all of the defendants believed their conduct was in the best interest of Isabella. The "Expected or Intended Injury" exclusion requires an assessment of the insured's subjective intent, and – no matter how vehemently one might disagree with their views – none of the defendants subjectively believed they were harming Isabella.

As with the analysis of an "occurrence," the pertinent question is whether the allegations describe an injury that was "expected or intended" **from Liberty's viewpoint alone**. No reasonable person would anticipate that a law school's representation of a client in a custody matter, or its instruction of students regarding civil disobedience, would lead to the smuggling of a child outside the country. Thus, the District Court properly ruled that the Jenkins Complaint alleges facts which are not subject to the "Expected or Intended Injury" exclusion.

## III. HANOVER HAS A DUTY TO DEFEND LIBERTY UNDER COVERAGE B OF THE POLICY.

Coverage B of the Policy provides coverage for allegations of "'personal and advertising injury' caused by an **offense** arising out of [the insureds] business…." (JA72) (emphasis added). The Policy defines "personal and advertising injury" to include "injury, including consequential 'bodily injury', arising out of one or more of the following offenses: (a) false arrest, detention or imprisonment...." (JA81.)

Hanover does not dispute that the Jenkins Complaint alleges a "personal and advertising injury" as that term is defined in the Policy. Instead, Hanover seeks to

circumvent its duty to defend on the basis of the "Knowing Violation" and "Criminal Acts" exclusions in Coverage B. Hanover avers that the exclusions apply here "because the Jenkins Complaint alleges not only knowing but intentional conduct by Liberty." (Hanover Brief, p. 45.) However, Hanover's emphasis on intentional conduct is misplaced, and it cannot meet its burden to show that the exclusions apply to the allegations regarding conduct by Liberty and its faculty. *Block Roofing,* 754 F. Supp. 2d at 823 (noting insurer's burden to prove application of policy exclusions).

A.    <u>The Exclusions Cited by Hanover Are Contrary to the Grant of Coverage for "Personal and Advertising Injury</u>."

The "Knowing Violation" and "Criminal Acts" exclusions cited by Hanover do not apply in this context because there is an irreconcilable tension between those exclusions and the express grant of coverage for "offenses" involving "false arrest, detention or imprisonment." Unlike Coverage A, which conditions coverage upon an accidental "occurrence," there is no requirement that a "personal and advertising injury" be accidental from the insured's viewpoint. To the contrary, Coverage B explicitly provides coverage for an "offense" involving "false arrest, detention or imprisonment." The language in Coverage B extends coverage to intentional acts and injuries. Thus, Hanover's arguments regarding intentional conduct by Liberty are simply irrelevant for purposes of Coverage B of

the Policy. Even where intentional conduct is alleged, that does not preclude coverage for "personal and advertising injuries."[7]

Virginia's rules of policy interpretation reinforce this conclusion. First, the word "offense" is not defined in the Policy, so the Court must look to its ordinary meaning. *Hill,* 237 Va. at 152, 375 S.E.2d at 729. "Offense" is commonly defined to mean "something that is wrong or improper" or "a criminal act." *See,* http://www.merriam-webster.com/dictionary/offense. The word "offense" does not carry any connotation of accidental conduct; rather, it encompasses intentional acts. Therefore, the use of the term "offense" in the Policy extends coverage to a policyholder's intentional acts.

There is also a stark difference between the "offense" language in Coverage B and the "occurrence" requirement in Coverage A of the Policy. If Hanover intended to limit coverage for "personal and advertising injuries" to accidental conduct, it would have used the same limiting language requiring an "occurrence"

---

[7] For this reason, Hanover's argument that "there is no such thing as accidental participation in a conspiracy'" is a red herring. (Hanover Brief, p. 46 (*quoting West Bend Mut. Ins. Co. v. Crichton,* 319 F. Supp. 2d 887, 889 (N.D. Ill. 2004). The *West Bend* case was not decided under a policy providing "personal and advertising injury" coverage for an "offense." Rather, the policy in that case provided coverage for a "'covered accident or incident,' which is defined as something that causes damage 'without an insured person expecting or intending any damage or injury.'" *West Bend*, 319 F. Supp. 2d at 889. By contrast, there is no requirement that conduct be accidental in order to be covered under Coverage B of the Policy at issue here.

that it employed with respect to coverage for "bodily injury" and "property damage." The fact that it did not do so further evinces its intent to extend Coverage B to intentional acts. *Bentley Funding Group*, 269 Va. at 330, 609 S.E.2d at 56 (holding that the absence of terms which could have been used in a contract are material to assessing the intent of the parties).

Moreover, the definition of "personal and advertising injury" expressly includes injuries caused by "false arrest, detention or imprisonment." (JA81.) These particular "offenses" constitute purely intentional acts. One does not accidentally arrest or detain another, nor can a policyholder imprison someone unintentionally. By definition, one who arrests, detains or imprisons another "knowingly violates" that person's rights. Indeed, the restriction of one's rights is the precise purpose of imprisonment. Under Hanover's reading, the exclusion would completely eviscerate coverage for offenses that are specifically identified as covered. Indeed, Hanover could invoke the "Knowing Violation" exclusion in its policy for literally any claim asserting "false arrest, detention or imprisonment."

The same is true for the "Criminal Acts" exclusion. The policy cannot simultaneously grant coverage for an "offense" – which is commonly understood to include a criminal act – and then negate such coverage by excluding "Criminal Acts." This is especially true for offenses involving "false arrest, detention or imprisonment," as it is a criminal offense to detain another person against his or

her will without lawful justification. *Virginia Code Sec. 18.2-47.* Thus, the Policy's explicit extension of coverage to certain criminal offenses is at odds with the exclusion for unspecified "Criminal Acts."

In the present context, the exclusions for "Knowing Violations" and "Criminal Acts" as construed by Hanover would eliminate coverage for acts which the Policy expressly lists as covered offenses. Virginia law does not allow such a result. An insurer cannot "give [coverage] with the right hand and then take away with the left." *Fuisz*, 61 F.3d at 243*; see also, Liberty Life Ins. Co. v. Commercial Union Ins. Co.*, 857 F.2d 945, 951 (1988) (rejecting insurer's argument that intentional advertising injury was not covered because it "would make much or all of the advertising liability coverage illusory.") The Policy cannot give coverage for a specified "offense" involving the detention of another and then take that coverage away on the grounds that such detention violates that person's rights or is criminal in nature. Thus, to the extent the exclusions would eradicate the coverage provided for claims of "false arrest, detention or imprisonment," the exclusions are invalid.

At the very least, the inherent contradiction between the express grant of coverage for "offenses" of "false arrest, detention or imprisonment" and the exclusions for "Knowing Violations" and "Criminal Acts" creates an impossible ambiguity in the Policy. The Court must strictly construe the exclusionary

language in the Policy against Hanover. *Fuisz, 61 F.3d at 242.* Because the exclusions on which Hanover relies directly contradict the specific extension of coverage for the delineated offenses, the Court must find in favor of coverage. *Webb,* 235 Va. at 657, 369 S.E.2d at 198.

> B.  The Exclusions Cited by Hanover Do Not Apply Because the Jenkins Complaint Does Not Allege Knowing or Criminal Conduct "Committed by or at the Direction of" Liberty.

Even if Hanover could overcome the incongruity between the exclusions at issue and the Policy's express extension of coverage to offenses of "false arrest, detention or imprisonment," Hanover cannot meet its burden to show that the exclusions apply to the facts alleged in the Jenkins Complaint.

> 1.  *The allegations against Liberty do not implicate the "Knowing Violation" exclusion.*

The "Knowing Violation" exclusion applies to "'personal and advertising injury' caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict 'personal and advertising injury.'" (JA73.) This exclusion does not apply to the allegations against Liberty for several reasons.

First, the Jenkins Complaint does not allege that Lisa Miller's detention of Isabella was "**caused by or at the direction of**" Liberty. (JA73.) There is no allegation that Liberty had control over Miller or the ability to "cause or direct" her to flee the country with her child. In fact, the Jenkins Complaint expressly avers

41

that the faculty at Liberty who represented Miller "have at all times maintained that they did not know their client's location to various courts in Vermont…and Virginia, and to the press that she simply stopped communicating with them and disappeared."  (JA47, ¶ 58.)   Instead, Jenkins alleges that Liberty is liable for Isabella's detention because Liberty represented Miller during the custody dispute, taught its students that civil disobedience may be appropriate in certain circumstances, and generally engaged in the public discourse regarding parental rights of same-sex couples.  (JA45, ¶¶ 47, 49, 60.)  Such conduct hardly rises to the level of "causing or directing" Lisa Miller to abduct her child and flee the country.

Nor does the Jenkins Complaint allege that Liberty undertook any action "with the knowledge that the act would violate the rights of another."  (JA73.)  For the same reason that the Jenkins Complaint alleges an "occurrence" under Coverage A of the Policy, the Jenkins Complaint does not allege that Liberty knew the conduct of its authorized agents would lead to Isabella's kidnapping or a violation of her rights. Section III.D.

In fact, the Jenkins Complaint avers that Liberty is liable because its conduct **ratified** the tortious acts of others.  (JA45, ¶49.)  Implicit in this allegation of "ratification" is the fact that these other individuals had already acted when Liberty adopted or ratified their conduct.  Liberty could not "cause or direct" conduct that had already occurred.

42

Finally, the "separation of insureds" clause is again pertinent. Even if one or more of Liberty's employes "directed" the kidnapping of Isabella (which is not alleged), that conduct is not imputed to Liberty under the Policy.

In its Brief, Hanover glosses over the "caused by or at the direction of" language in the exclusion and utterly ignores the separation of insureds clause. Instead, Hanover argues that the exclusion applies because the Jenkins Complaint alleges that Liberty "encouraged its agents to disregard state laws" and thus, Liberty acted "with the knowledge that the act would violate the rights of another." (Hanover Brief, p. 47). However, the allegations at hand do not support the leap that Hanover encourages the Court to make. Nothing in the Jenkins Complaint suggests that Liberty knew Lisa Miller would flee to Nicaragua with Isabella, much less that Liberty "caused or directed" her to do so.

Hanover also relies upon *Travelers Prop. Cas. Co. of Amer. v. Mericle*, 486 Fed. Appx. 233 (3rd Cir. 2012) for the proposition that because conspiracy involves intentional conduct, allegations of conspiracy necessarily invoke the "Knowing Violation" exclusion. (Hanover Brief, p. 46.) This is incorrect. As set forth above, there is no requirement that a "personal and advertising injury" be accidental in order to be covered under the policy. Notably, courts have upheld coverage for conspiracy claims. *Jefferson-Pilot Fire & Casualty Co. v. Boothe, Prichard & Dudley*, 638 F.2d 670 (1980) (applying Virginia law); *Capano*

43

*Management Co. v. Transcontinental Ins. Co.,* 78 F.Supp. 2d 320, 331–32 (D.Del.1999) ("Because there is a duty to defend the underlying wrong ... there is a corresponding duty to defend the civil conspiracy claim.")

Finally, *Mericle* is easily distinguished from the case at bar. *Mericle* arose out of a massive class action suit against the builder of juvenile detention facilities in Pennsylvania. 486 Fed. Appx. at 234. Plaintiffs alleged the builder orchestrated a kickback scheme under which he paid two state court judges in Pennsylvania to facilitate the building of juvenile detention facilities and impose "harsh sentences on juveniles in order to ensure the facilities would be used." *Id.* By contrast, the Jenkins Complaint does not allege that Liberty initiated, caused or directed the kidnapping of Isabella. It is not even alleged that Liberty consciously acted in furtherance of the alleged conspiracy. Rather, the Jenkins Complaint alleges that Liberty's clinical representation of Lisa Miller and its scholastic pronouncements in the debate over same-sex parental rights render Liberty liable for the intentional acts of others. Unlike the insured in *Mericle,* who directly orchestrated a judicial kickback scheme to profit from inflated jail sentences, the facts alleged here do not in any way suggest that Liberty "caused or directed" the kidnapping of Isabella.

44

2. *The allegations against Liberty do not implicate the "Criminal Acts" exclusion.*

The "Criminals Acts" exclusion applies to "'personal and advertising injury' arising out of a criminal act **committed by or at the direction of** the insured." (JA73) (emphasis added).

Just as there is no allegation that Liberty "caused or directed" conduct sufficient to trigger the "Knowing Violation" exclusion, there is no allegation that Liberty "committed or directed" any criminal acts. Liberty itself is not accused of kidnapping Isabella. Nor does the Jenkins Complaint allege that Liberty "directed" any individuals who helped Lisa Miller kidnap Isabella. Only if an authorized agent of Liberty committed a crime while acting on Liberty's behalf would this exclusion apply to bar coverage for Liberty. Because the Jenkins Complaint does not include such allegations, Hanover's reliance on this exclusion is misplaced.

Hoping to circumvent the factual allegations (or lack thereof) regarding Liberty's conduct, Hanover again relies upon the nature of the causes of action asserted to support its argument. Hanover also cites to conclusory allegations regarding intentional conduct directed toward all of the defendants. (Hanover

45

Brief, p. 48.)  As previously set forth, this violates Virginia law requiring courts to assess the specific facts pled regarding the nature of an individual's conduct.[8]

Hanover also continues its efforts to impute Hyden's alleged conduct to Liberty.  (Id.)  As set forth previously, however, there is no basis for this argument, and it flies in the face of the Vermont Court's rulings. *Supra,* Section II.C.2.  The Jenkins Complaint simply does not allege any facts to support the fundamental supposition of Hanover's argument: that Hyden acted on behalf of Liberty.

Hanover also cites allegations in the Jenkins Complaint that one of the individual defendants, Philip Zodhiates, attempted to call the Dean of the Liberty Law School, Matthew Staver, around the time of Lisa Miller's disappearance. (Hanover Brief, p. 48.)  Such allegations do not impute any criminal conduct to Liberty.  First, simply receiving a phone call (which is all that is alleged) is not criminal, no matter whom the caller may be.  Second, there is no allegation that Staver was acting in an official capacity for Liberty University at the time the alleged calls were placed.  Third, there is no  allegation that  Staver  actually  ever

---

[8] Even if the causes of action were pertinent, Hanover neglects to mention that the Jenkins Complaint includes a claim for conspiracy to violate civil rights. (JA51.) That particular cause of action is based upon a statute providing a purely civil cause of action, not upon any criminal conduct.

spoke to Zodhiates on the date in question.  In truth, he did not.[9]  While Hanover wants the Court to infer that Staver was involved in the conspiracy to kidnap Isabella, it is just as likely that Lisa Miller asked Mr. Zodhiates to call Staver, who was her legal counsel, to relay a message regarding his representation of her.  If there were reason to believe that Matthew Staver actually was involved in the plan to help Lisa Miller abscond, he would be named as a defendant in the Jenkins Complaint.  Hanover cannot invoke the "Criminal Acts" exclusion on the basis of Staver's conduct when Jenkins does not even allege that Staver engaged in any criminal act.

Even if there were specific allegations accusing Liberty of criminal conduct, Hanover would not be excused from its duty to defend because the Jenkins Complaint also alleges that Liberty is liable in respondeat superior for non-criminal acts.  The Jenkins Complaint hypothesizes that Liberty is liable for ratifying the detention of Isabella by virtue of its representation of Lisa Miller and its classroom instruction regarding civil disobedience.  (JA45, ¶49.)  "Where both covered and excluded acts are alleged, the duty to defend attaches."  *Fuisz*, 61 F.3d at 245. Thus, the allegations regarding non-criminal conduct by Liberty trigger the duty to

---

[9]  A copy of an affidavit that Mathew Staver filed in the Jenkins Complaint was submitted to the District Court as an exhibit to Liberty's Brief in Opposition to Hanover's Motion for Summary Judgment. (Docket No. 44, at Exhibit 1.)   In the affidavit, Staver explains that he never spoke with Philip Zodhiates regarding Lisa Miller's whereabouts.

defend regardless of whether other allegations involving criminal conduct by Hyden or other defendants can be imputed to Liberty.

Finally, it is worth noting again the impact of the "separation of insureds" provision upon this issue.  Even if there were allegations that Hyden and/or Staver engaged in criminal conduct, the "separation of insureds" language prevents Hanover from imputing those criminal acts to Liberty.

The bottom line is that the Jenkins Complaint does not allege any facts from which one could conclude that criminal acts associated with the kidnapping of Isabella were "committed by or at the direction of" Liberty.  By completely glossing over this language in the "Criminal Acts" exclusion, Hanover tacitly concedes that no such facts are pled.  Ultimately, that means that Hanover is unable to meet its burden to show that the exclusion applies.

## IV.  HANOVER HAS A DUTY TO DEFEND LIBERTY UNDER THE SCHOOL AND EDUCATORS LEGAL LIABILITY COVERAGE OF THE POLICY.

### A.    The Jenkins Complaint Alleges Covered "Wrongful Acts."

The insuring clause of the School and Educators Legal Liability Endorsement ("SELL Endorsement") compels Hanover to defend Liberty against claims for "'loss' because of any 'wrongful act.'"  (JA115-16.)   The term "wrongful act" is defined in the endorsement to include:

> any breach of duty, neglect, error, omission, misstatement, or misleading statement committed by an insured:
>
> a. In the lawful discharge of the duties that are characteristic of, distinctive or inherent to the operation and functioning of an educational institution; and
>
> b. While acting within the course and scope of their duties for the named inured.

(JA130.)

Hanover contests its duty to defend under the SELL Endorsement on the grounds that the Jenkins Complaint does not allege a "wrongful act." (Hanover Brief, pp. 50-52.) Hanover argues that participating in a conspiracy to kidnap a child would not fall within the "lawful discharge" of duties characteristic to an educational institution. (Id.) Instead, Hanover asserts, the conduct attributed to Liberty is "extraneous" to the functioning of an educational institution. (Id.)

The problem with Hanover's argument is that the Jenkins Complaint does not allege that Liberty directly participated in the kidnapping of a child. Rather, the Jenkins Complaint sets out a novel theory against Liberty based upon a variety of allegations which fall well within the sphere of Liberty's academic activities. For example, the Jenkins Complaint avers that Mathew Staver and Rena Lindevaldsen "routinely instructed their Law School students that the correct course of action for a person in Lisa Miller's situation would be to engage in 'civil disobedience' and defy court orders." (JA45, ¶47) (emphasis added). Classroom

instruction clearly falls within the duties characteristic of an educational institution. Moreover, faculty in Virginia's law schools frequently advocate or comment upon civil disobedience as part of their scholarly work.[10]

The Jenkins Complaint also alleges that Liberty faculty published books, articles and/or made public pronouncements defending Lisa Miller's fight for custody of Isabella and criticizing the efforts to locate Isabella. (JA48, ¶60.) Educational institutions and their faculty regularly engage in these types of activities. In fact, a quick internet search reveals numerous recent articles by students and faculty associated with Virginia law schools regarding the same-sex debate.[11]

---

[10] Matthew Farley, *Challenging Supremacy: Virginia's Response to The Patient Protection and Affordable Care Act*, 46 U. Rich. L. Rev. 37 (2010) (discussing civil disobedience in the context of Obamacare); W. Bradley Wendel, *Civil Obedience*, 104 Colum. L. Rev. 363 (2004) (article discussing the interaction of legal ethics and civil disobedience within the legal profession written by professor at the Washington & Lee University School of Law.); William H. Simon, *Should Lawyers Obey the Law?*, 38 Wm. & Mary L. Rev. 217 (1996).

[11] *See, e.g.,* Nelson Lund, *Same-Sex Marriage in the Courts of Law and Reason*, 14 Engage: J. Federalist Soc'y Prac. Groups 16 (2013) (written by professor at George Mason University Law School); Kathryn L. Marshall, *Strategic Pragmatism or Radical Idealism?: The Same-Sex Marriage and Civil Rights Movements Juxtaposed,* 2 Wm. & Mary Pol'y Rev. 194 (2010); Courtney Cahill, *The Genuine Article: A Subversive Economic Perspective on The Law's Procreationist Vision of Marriage*, 64 Wash. & Lee L. Rev. 393 (2007); William Eskridge, Jr., *A History of Same Sex Marriage,* 79 Va. L. Rev. 1419 (1993).

In addition, the Jenkins Complaint avers that Liberty faculty represented Lisa Miller in her custody battle with Jenkins (JA41-47, ¶¶22, 47, 58, 59.)  Such legal representation is also characteristic of most law school curricula.  Law schools routinely offer – and promote – clinical opportunities for students to work alongside faculty and practitioners in specific areas of law.[12]

Citing these allegations, the District Court correctly determined that the Jenkins Complaint alleged conduct by Liberty that is "characteristic of, distinctive or inherent to the operation and functioning of [a typical law school]."  The District Court noted that "[c]lassroom discussions about civil disobedience, and even saying that a person in Miller's situation should defy court orders, fall well within the parameters of debate and education at a law school."  (JA330.)  Similarly, the District Court found that "[r]epresenting clients and teaching students about legal representation through clinics is a common and beneficial activity for law schools." (Id.)  Thus, the allegations in the Jenkins Complaint bring this case within the broad definition of "wrongful act" under the SELL Endorsement.

The best that Hanover can do in rebutting these points is to aver that the "allegation regarding classroom discussions about civil disobedience…**simply provide[s] background and color** – it is not the basis on which Jenkins claims

---

[12] *See, e.g., http://www.law.virginia.edu/html/academics/clinic.htm; http://law.wm.edu/academics/programs/jd/electives/clinics/index.php; http://law.richmond.edu/ academics/clinical-programs/index.html; http://law.wlu.edu/clinics/.*

"injury" that would trigger coverage under the SELL Coverage." (Hanover Brief, p. 52) (emphasis added). Hanover urges the Court to simply disregard specific factual allegations in the Jenkins Complaint. Such a selective reading of the allegations obviously violates Virginia's Eight Corners rule, which requires the Court to find in favor of coverage "whenever the complaint alleges facts and circumstances, **some of which**¸ if proved, would fall within the risk covered by the policy." *Resource Bankshares,* 407 F.3d 631, 636 (4th Cir. 2005).

Hanover also posits that instructing students when civil disobedience may be proper is not a "lawful discharge" of duties associated with an educational institution. (Hanover Brief, p. 52.) However, Hanover points to no statute or common law concept that would support the idea that it's "unlawful" to advocate a position when teaching students about civil disobedience. Just because one does not agree with the content of Liberty's teachings in the present context of same-sex parental rights does not render Liberty's classroom instruction "unlawful."

Because the Jenkins Complaint alleges injuries arising out of Liberty's lawful conduct as an educational institution, the District Court properly ruled that Hanover has an independent obligation to defend Liberty under the SELL Endorsement.

### B. The Criminal Acts Exclusion in the SELL Endorsement Does Not Eliminate Hanover's Duty to Defend.

Hanover's final argument avers that the "Intentional or Criminal Acts" exclusion in the SELL Endorsement abrogates its duty to defend Liberty. That exclusion applies to "[a]ny claim arising out of any intentional, dishonest, fraudulent, criminal, or malicious act or omission or any willful violation of law by the insured." (JA114). For reasons already addressed above, this exclusion does not apply.

First, like coverage for a "personal and advertising injury" under Coverage B of the Policy, the SELL Endorsement does not require that injuries arise out of an "occurrence." Rather, the SELL Endorsement provides coverage for "wrongful acts." Like an "offense," the broad definition of "wrongful acts" in the SELL Endorsement extends to both accidental and intentional acts. In arguing that allegations of intentional conduct by Liberty trigger the exclusion, Hanover reads into the SELL Endorsement an "occurrence" or accident requirement that simply is not there. (Hanover Brief, pp. 53-54.) Such a construction of the Policy would eradicate the coverage that Liberty purchased under the SELL Endorsement. As discussed previously, an insurer cannot craft and enforce an exclusion that renders coverage illusory. *See, Fuisz*, 61 F.3d at 243; *Caliber One Indem. Co.,* 367 F. Supp. 2d at 1003; *Liberty Life Ins. Co.*, 857 F.2d at 951.

In any event, the allegations regarding the teachings, publications and representation of Lisa Miller by Liberty's faculty do not involve criminal acts or willful violations of law. There is nothing illegal or fraudulent about Liberty's alleged clinical representation of Lisa Miller or its educational instruction regarding civil disobedience.

Nor can Hanover rely on allegedly criminal conduct by other defendants to invoke this exclusion against Liberty. First, the Jenkins Complaint does not allege that Hyden or any other alleged agent of Liberty was acting on behalf of Liberty. Because Hyden acted individually, and not on behalf of Liberty, her conduct is not chargeable to Liberty under the SELL Endorsement, and Hanover cannot point to Hyden's alleged criminal acts as a basis for disclaiming its duty to defend Liberty.

Second, like the Policy, the SELL Endorsement includes a "separation of insureds" provision. (JA126.) While the "Intentional or Criminal Acts" exclusion purports to bar coverage "for all insured persons under the policy regardless whether the person seeking coverage participated in any way in the intentional or criminal acts or omissions" (JA114), that language contradicts the "separation of

insureds" clause also found in the SELL Endorsement.[13]    (JA126.)    This inconsistency creates an ambiguity regarding coverage that must be construed in favor of Liberty.    Thus, even if one of Liberty's employees did intentionally commit an unlawful act, that would not bar Liberty's right to a defense from Hanover.

Finally, it is worth noting that Hanover has the burden to show that the exclusion applies.    Even if the Jenkins Complaint alleged facts to impute criminal conduct to Liberty, it also alleges that Liberty is liable as a result of its faculty's non-criminal classroom instruction and representation of Lisa Miller.    Where multiple facts are alleged, some of which are covered and other excluded, the duty to defend attaches. *Fuisz*, 61 F.3d at 245.    Only upon a final adjudication of the claim would Hanover be able to demonstrate whether any judgment against Liberty was premised upon (i) criminal conduct by Hyden or (ii) the non-criminal actions of its faculty.    Absent a final adjudication, Hanover cannot meet its burden to show that the exclusion applies.    Hanover should have defended Liberty under a reservation of rights, rather than denying coverage outright.

---

[13] The restrictive language in the "Criminal Acts" exclusion of the SELL Endorsement (which purports to exclude coverage for **all** insureds whenever **any** insured commits an excluded criminal act) further confirms that the District Court's reading of the "separation of insureds" provision elsewhere in the Policy is correct.    The SELL Endorsement's "Criminal Acts" exclusion contains such restrictive language precisely because, pursuant to the "separation of insureds clause," the rest of the Policy treats all insureds individually for purposes of assessing intentional conduct and the right to coverage.

## <u>CONCLUSION</u>

Liberty respectfully requests that the Court affirm the District Court's April 16, 2014 Opinion and Order granting summary judgment in favor of Liberty regarding Hanover's duty to defend Liberty against the Jenkins Complaint and affirm the judgment order entered by the District Court on November 6, 2014.

LIBERTY UNIVERSITY, INC.

By:  */s/ Harold E. Johnson*
Of Counsel

Harold E. Johnson (VSB # 65591)
hjohnson@williamsmullen.com
Calvin W. Fowler, Jr. (VSB # 27982)
wfowler@williamsmullen.com
Williams Mullen
200 South 10th Street
P. O. Box 1320
Richmond, VA  23218-1320
(804) 420-6000; (804) 420-6507 (Fax)
*Counsel for Appellee*
*Liberty University, Incorporated*

## <u>CERTIFICATE OF COMPLIANCE WITH RULE 32(a)</u>

Certificate of Compliance with Type-Volume Limitation, Typeface Requirements and Type Style Requirements

1.  This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

    The word count of this brief is 12,835 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

    This brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14 point Times New Roman font style.


*/s/ Harold E. Johnson*

Harold E. Johnson (VSB # 65591)
hjohnson@williamsmullen.com
Calvin W. Fowler, Jr. (VSB # 27982)
Williams Mullen
200 South 10th Street
P. O. Box 1320
Richmond, VA  23218-1320
(804) 420-6000; (804) 420-6507 (Fax)
*Counsel for Appellee*
*Liberty University, Incorporated*

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on February 12, 2015, the required copies of the foregoing Response Brief of Appellee were filed with the Clerk of the Court via hand delivery and electronically using the Court's CM/ECF System, which will send notice of such filing to the registered CM/ECF users listed below.   I further certify a copy of the Response Brief of Appellee was served, via U. S. Postal Service, postage-paid, on the following:

Wystan M. Ackerman
John P. Malloy
Robinson & Cole LLP
280 Trumbull Street
Hartford, CT 06103-3597
wackerman@rc.com
jmalloy@rc.com

Thomas S. Garrett
Harman, Claytor, Corrigan & Wellman
P.O. Box 70280
Richmond, VA 23255
tgarrett@hccw.com

 */s/ Harold E. Johnson*

Harold E. Johnson (VSB # 65591)
hjohnson@williamsmullen.com
Calvin W. Fowler, Jr. (VSB # 27982)
wfowler@williamsmullen.com
Williams Mullen
200 South 10th Street
P. O. Box 1320
Richmond, VA  23218-1320
(804) 420-6000; (804) 420-6507 (Fax)
*Counsel for Appellee*
*Liberty University, Incorporated*